922 A.2d 554

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Randall E. GOFF.**

**Misc. AG Docket No. 56, Sept. Term, 2005.**

Court of Appeals of Maryland.

May 8, 2007.

**2**

Dolores O. Ridgell, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel, Atty. Grievance Com'n), for petitioner.

Benjamin Lipsitz, Baltimore, for respondent.

Argued before BELL, C.J., RAKER, WILNER *, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BELL, C.J.

Bar counsel, acting on behalf, and with the approval, of the petitioner, the Attorney Grievance Commission of Maryland, filed in this Court, pursuant to Maryland Rule 16–751,[1] a Petition For Disciplinary or Remedial Action charging the respondent, Randall E. Goff, with violating Rules 1.1, Competence,[2] 1.3, Diligence,[3] 1.15, Safekeeping Property,[4] 5.3, Re-

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Maryland Rule 16–751, as relevant, provides:

   "(a) *Commencement of disciplinary or remedial action.* (1) Upon approval of the Commission. Upon approval or direction of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals."

2. Rule 1.1 provides:

   "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

3. Rule 1.3 provides:

   "A lawyer shall act with reasonable diligence and promptness in representing a client."

4. Maryland Rule 1. 15 now provides:

   "(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate

sponsibilities Regarding Non-lawyer Assistants,[5] 8.1, Bar Admission and Disciplinary Matters,[6] and 8.4, Misconduct,[7] of the

> account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules.  Other property shall be identified as such and appropriately safeguarded.  Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
>
> "(b) A lawyer may deposit the lawyer's own funds in a client trust account for the sole purpose of paying bank service charges on that account, but only in an amount necessary for the purpose.
>
> "(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, a lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred.
>
> "(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person.  Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
>
> "(e) When in the course of representation a lawyer is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved.  The lawyer shall promptly distribute all portions of the property as to which the interests are not in dispute."

What is now Rule 1.15(d), was, when the charged conduct occurred, Rule 1.15(b).

5. "With respect to a non lawyer employed or retained by or associated with a lawyer:

> "(b) A lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer. . . ."

6. Pertinently, Rule 8.1 provides:

> "An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
>
> "(a) knowingly make a false statement of material fact;  or
>
> "(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6."

7. Rule 8.4, as relevant, provides:

Maryland Rules of Professional Conduct, as adopted by Maryland Rule 16–812, Maryland Rule 16–609, Prohibited Transactions,[8] pertaining to his attorney trust account, and Maryland Code (2000, 2004 Repl.Vol., 2006 Supp.) § 10–306, Limitation on use of trust funds,[9] of the Business Occupations and Professions Article.

We referred the case, pursuant to Rules 16–752(a),[10] to the Honorable Michelle D. Jaklitsch, of the Circuit Court for Anne Arundel County, for hearing pursuant to Rule 16–757(c).[11]

---

"It is professional misconduct for a lawyer to:

\* \* \* \* \* \*

"(c) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

"(d) engage in conduct that is prejudicial to the administration of justice."

\* \* \* \* \* \*

**8.** Rule 16–609 provides:

"An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer."

**9.** Section 10–306 proscribes a lawyer's "use [of] trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer."

**10.** Rule 16–752(a) provides:

"(a) Order. Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing."

**11.** Maryland Rule 16–757(c) provides:

"(c) Findings and conclusions. The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed. Unless the time is extended by the Court of Appeals, the written or transcribed statement shall be filed with the clerk responsible for the record no later than 45 days after the

Following a hearing, the court issued an extensive, detailed and lengthy opinion in which it made findings of fact and drew from those facts, conclusions of law. Although acknowledging that the respondent "holds a license as a title insurance agent from the Maryland Insurance Commission" and is an agent with Fidelity National Title Co., which accounts for "[a]bout eighty percent of Respondent's present practice (and a commensurate proportion of his income)," the hearing court determined that the grievance matter then before it "arose" from the respondent's practice of law, "from events surrounding Respondent's representation of Mark A. Heiss." That representation involved estate and real estate matters, areas that made up a substantial portion of the other twenty percent of his "practice." The representation started when Heiss sought the respondent's services to open an estate for his mother, Vivian Pauline Heiss. The need for such representation was prompted by, and became apparent with, the revelation that the several—there were eight or nine of them—parcels of property on which the house where Heiss and his parents had lived in Anne Arundel County were not titled in his mother's name, but in the names of Heiss's father, Raymond, and his two brothers, Charles and Arthur, as "[s]ome of the parcels were titled in Raymond Heiss's and Charles Heiss's names and others were titled in all three brothers' names."

The manner in which the parcels were titled was of some significance to family members and entities other than Mark Heiss, the Estate of his mother and the Estate of Raymond Heiss. The beneficiaries of the estates of Charles and Arthur Heiss, in addition to the estates themselves, also had an interest in the property. As a result, those interested parties obtained representation to protect their interests.[12] Although

---

conclusion of the hearing. The clerk shall mail a copy of the statement to each party."

12. The hearing court identified the interested parties as: Catherine Heiss, John E. Heiss, Wilda Heiss, the Estate of Charles Heiss, Jr., the Estate of Raymond Heiss and the Estate of Arthur Heiss. In a footnote, the court refers to "Jack" Heiss. We assume that the reference is to John Heiss, as it is that name that is used throughout the opinion.

the interested parties agreed that the properties should be sold, they could not agree on whether and how much Mark Heiss was entitled to be reimbursed for maintenance expenses on the home in which his mother lived. To resolve this issue, the respondent brought an action against the other interested parties. That action was settled. As relevant to this case:

"The agreement called for the properties to be sold, for Mark Heiss to receive $20,000.00 as reimbursement for expenses incurred for the maintenance of the property and, after deducting costs of the sale and payment of all liens and taxes from the proceeds of the sale, the balance of the funds w[as] to be distributed to the estates of the deceased brothers and the various interested parties."

Pursuant to the settlement agreement, the respondent agreed to open an estate in Maryland for Arthur Heiss and, after the properties had been sold, to distribute the proceeds, after costs, to the various interested parties. For his services, the agreement provided that the respondent would be paid, from the sale proceeds, $10,000.00.

After being appointed special administrator of the Estate of Arthur Heiss, the respondent opened estates for Vivian Pauline Heiss and Raymond Heiss. Thereafter, all of the parcels of property were sold for $200,000.00, which was deposited into the respondent's attorney trust account. Subsequently, within a couple of months of the settlement, all of the proceeds of the sale, except that due to the Estate of Arthur Heiss, had been distributed. Of particular relevance to the case sub judice, in addition to the reimbursement amount provided for in the settlement agreement, Mark Heiss had also been distributed, from his father's estate, through his mother's estate, a check for $65,000.00. It subsequently was determined that that distribution was made in error, that it constituted an overpayment.

When no distribution had been made to the Estate of Arthur Heiss, inquiry of the respondent as to why was made by John Heiss. Initially told that distribution would be made after a wait of six weeks, extended to six months, John Heiss

referred the matter to his attorney when that schedule was not met.

John Heiss's attorney spoke to the respondent on the telephone and sent him a facsimile seeking "confirm[ation] that the final accounting had been prepared and the funds forwarded to the attorney for the Estate of Helen Peters, the sole beneficiary of the Estate of Arthur Heiss, in New Jersey." The respondent did not respond to that letter. Subsequent letters were sent over the next several months, each seeking information about the "final accounting and the transmission of the escrow funds." These letters either were not answered at all or answered untimely. Distribution to the Estate of Arthur Heiss was made on or about August 2, 2003, some 13 or 14 months after the settlement on the properties.

By that time, a complaint "concerning Respondent's conduct in handling the proceeds of the sale of the Heiss properties" had been filed by John Heiss's attorney with Bar Counsel. Pursuant to that complaint, Bar Counsel wrote the respondent to notify him of the complaint and to request information concerning his side of the matter. Bar Counsel's letter thus asked for both a written response and "certain financial records relating to the settlement described in the complaint." Although he supplied the written response, as requested, denying any wrong-doing and indicated that, by then the disbursement had been made,[13] the respondent did not provide the financial records.

The petitioner conducted an investigation, during the course of which it obtained records from the respondent and one of its investigators interviewed him. The respondent offered an explanation for the delay in disbursing the funds to the Arthur Heiss Estate:

"He had to wait 6 months after the estate was closed to give creditors an opportunity to file claims; he was unsure whether the old rules or the new rules applied to the estate

---

13. In his response, the respondent advised that the funds were disbursed on or about July 20, 2003. Subsequent documentation reveals that it was actually done on August 2, 2003.

since the decedent passed away in 1963; there was a problem calculating taxes because it was based on the percentage of the interest in the property; he first attempted to probate the estate in Alabama; he had to obtain guidance from the Anne Arundel County Register of Wills Office; and he had a computer failure during April 2003 and had not backed up the system since December 2001; and he was handling two estates for the same family at the same time."

He also maintained that "the funds owed to the Estate of Arthur Heiss remained in [his] trust account until he disbursed those funds to the estate."

As to the latter contention, the findings of the hearing court were to the contrary. It determined that "the balance of the trust account fell below the amounts owed to the Estate of Arthur Heiss between May 15, 2002 and the date the funds were disbursed to the interested parties on or about August 2, 2003." More particularly, the hearing court found, as to the respondent's "[t]rust [a]ccount [b]alance [d]iscrepancies":

"The trust account balance on April 10, 2003 was $378.42. However, at this time, the amount owed to the Estate of Arthur Heiss/Helen Peters was approximately $31,000.00. When including amounts owed to other matters, the trust account should have had a balance of $283,294.88. ($60,-000.00 in trust funds had been erroneously deposited into Respondent's office/operating account.)

"Furthermore, a paralegal employed by Petitioner, John Debone, conducted an analysis of the trust account. Although Respondent did not provide a complete and accurate accounting for all of the funds received and disbursed in connection with the sale of the Heiss Properties, DeBone created a spreadsheet evidencing payments and disbursements for trust account number 9983 where the Heiss funds were deposited, as well as for Respondent's second trust account number 1794. Petitioner discovered that Respondent disbursed approximately $1,256.87 more than he collected for the Heiss sale.

"Additionally, Respondent paid some of the expenses related to the Heiss sale and estates from his office/operating account. At least four checks totaling $3,775.59 were disbursed from Respondent's office/operating account on behalf of the Heiss matter.

"Respondent's records also indicate that Respondent generated checks on trust account 9983 and deposited those checks back to the same account. Respondent told DeBone that Fidelity National [14] recommended this to create a paper trail when there was a first and second mortgage."

(Record references and footnote omitted).

There were other account balance discrepancies that the petitioner discovered, and the hearing court found, in the respondent's trust account. They related to transactions other than the Heiss settlement and resulted primarily from the respondent's disbursal of funds for the transaction before the funds for the settlement were deposited. The time discrepancy was as much as almost two and a half months and the amount involved, as much as $200,000.00. There were also instances in which the "[r]espondent's records reflected that there were funds for some settlements conducted in 2002 and 2003 that had not yet been disbursed by March 2004." The hearing court found also that, in some of the non-Heiss settlements, the respondent's records did not match the bank records, i.e.:

"Checks marked void on Respondent's records had actually cleared the account. Funds in the same amount were disbursed twice to the same person, deposits to the bank account did not appear on Respondent's records, and checks were negotiated through the bank that did not appear on Respondent's records."

(Record references omitted). The accidental deposit of trust funds into the respondent's office/operating account was another reason for the discrepancy in the records. Although the respondent became aware of the mistaken deposit within a

---

14. Fidelity National Property and Casualty Insurance Group.

week of its occurrence and took some corrective action immediately, the hearing court determined that, contrary to his testimony, "the mistakes were not corrected entirely until June 2, 2003," more than two months later.

During the petitioner's investigation of the Heiss matter, overdrafts in one of the respondent's trust accounts, albeit not the one used in the Heiss settlement, were reported. This prompted an expansion of the investigation to cover these matters and, therefore, a request for information with respect to them. As to this aspect of the petitioner's investigation and the respondent's response, the hearing court reported:

"On March 8, 2004, while the investigation of the Heiss matter was ongoing, Bar Counsel received notification of an overdraft on a second Wachovia Bank attorney trust account (account number ending in 1794) held by Respondent. On or about March 11, 2004, Bar Counsel wrote to Respondent and requested, within ten days, an explanation for the overdraft and copies of financial records relating to attorney trust account number 1794. Respondent did not respond within ten days.

"On or about March 17, 2004, Bar Counsel received notice of a second overdraft occurring on March 12, 2004 in this same attorney trust account. On or about March 17, 2004, Respondent was notified by letter of the second overdraft notice. Bar Counsel's letter requested that Respondent provide an explanation for the overdraft and copies of financial records within ten days. Respondent did not respond in a timely manner to this request for information.

"On or about March 19, 2004, Bar Counsel received notice of a third overdraft in attorney trust account 1794. The matter was then docketed for investigation. On or about April 20, 2004, Assistant Bar Counsel wrote to Respondent to notify him that the matter had been docketed and to request an explanation for the overdrafts and copies of financial records.

"Respondent responded to Bar Counsel's letters of March 11 and 17, 2004 on or about April 21, 2004. Respondent

explained that the overdrafts occurred because he had opened a new trust account on January 1, 2004, but that several lenders had wired proceeds from settlement transactions to the old account rather than to the new one.... In this response, Respondent failed to provide all of the documents Bar Counsel requested. Mr. DeBone was able to confirm that there appeared to be deposits made to the old account that should have been made to the new. Mr. DeBone was also able to track several instances where Respondent corrected this by transferring funds from the old account to the new account in February 2004. At one point. Respondent had corrected the mistake by transferring funds from the old account to the new account, but then erred by disbursing funds for that settlement from the old account. By March 2, 2004, however, all of the mistakes were corrected.

"The overdrafts occurred not because of these wiring mistakes, but due to a double payment of $374,977.17 to Homecomings Financial from the new trust account.

"Respondent did not include this in his explanation to Bar Counsel on April 21, 2004. On February 11, 2004, a double payment of $374,977.17 had been made from account number 1794 to Homecomings Financial. Respondent wired funds to Homecomings even though he had already issued a check in the same amount. Homecomings Financial told Respondent that the check was sent to the wrong office and that they would give Respondent an immediate credit for the funds with no additional interest accruing to the borrower, if Respondent wired the funds to them. After Homecomings gave Respondent its word, Respondent wired the funds. Respondent did not place a stop-payment on the check and the check cleared the same day the funds were wired. He was aware of the double payment as early as March 14, 2004. On March 19, 2004, the funds were returned to the attorney trust account.

"In the meantime, however, funds held in the new trust account as a result of other real estate settlements had been used to cover the deficit caused by the duplicate $374,977.17 disbursement. The bank records establish that $231,341.28

owed from the trust account as a result of a settlement deposit for a party named Fogle could not be disbursed from the account on March 2 and 9, 2004. The March 2nd report from the bank indicates that there was only $126,976.55 in the account. The funds for the Fogle transaction were deposited on March 1, 2004 and were transferred out of the account on March 23, 2004.

"Assistant Bar Counsel wrote Respondent again on June 8, 2004, requesting more information concerning the overdrafts within 15 days. This information was needed to complete the analysis of account number 1794. Respondent did not respond to the June 8, 2004 letter within 15 days.

"Respondent also failed to respond to requests for information in connection with the Heiss investigation. On March 31, 2004, Petitioner sent Respondent a letter in connection with the Heiss investigation which included a request for information within 10 days. Bar Counsel needed this information to complete the analysis of the account. Respondent did not respond within ten days.

"On April 14, 2004, another request for information was sent to Respondent requesting a response to the March 31st letter within 10 days. On June 3, 2004, DeBone spoke to Respondent by telephone. Respondent said that he was not aware of the letters and that he was going out of town. DeBone told Respondent that he would fax the letters to Respondent. Respondent did not say that was necessary. Respondent told DeBone that he would have somebody working on the documents requested while he was gone. A follow-up letter was sent on June 4, 2004. Respondent, however, did not respond.

"Respondent's daughter got married on May 23, 2004 and his son got married on June 6, 2004. Respondent provided some of the information following the issuance of a subpoena in November 2004. Respondent also provided additional information to Petitioner after December 2004."

(Record references omitted).

Trust account 1794 was the subject of a 2004 audit by Fidelity, whose regional manager, Frank Jablonski, was close-

ly monitoring the respondent's record keeping and financial accounting.[15] That audit "[n]oted file shortages, including deposits remaining outstanding or in transit for more than 72 hours, and 196 outstanding checks in excess of 90 days old." A 2005 audit of the same account yielded similar results: "file shortages and 220 outstanding checks more than 90 days old." This is inconsistent with Fidelity policy, which is "to have deposits made immediately or, if not possible, within 72 hours. The respondent was not sanctioned for his deficiencies.

Contributing to the respondent's record keeping and financial transactions issues were computer crashes that the respondent experienced. The hearing court made findings in that regard:

> "Respondent maintained records of his real estate settlements and his financial transactions on his office computer. In the spring of 2002, Respondent's software stopped working properly. He subsequently switched to a new software program. Respondent was able to recover most of what was lost during this incident from the computer and from paper records. The second computer problem occurred in the spring of 2003. Rather than a software problem, in this incident Respondent's hard drive crashed. He was not able to recover anything from the hard drive after this second incident. The only thing that came up on the monitor was a blue, error screen. The hard drive had reformatted itself so that it no longer contained any information. He had last backed up his computer in December 2001, so that he was able to recover that information, but data from December 2001 through April 2003 was gone and could not be retrieved."

(Record references omitted). Fidelity did not require the use of any particular computer software program, although Mr.

---

**15.** The monitoring did not consist of a review of every transaction in the trust account, rather, Jablonski, who is not a lawyer or an accountant, "would go to Respondent's office once a month or every other month to pick up documents and to see how things were going. In 2002 and 2003, he conducted "Abbreviated Reviews" of that trust account.

Jablonski had suggested to the respondent a "free software program" that he could use. Other than requesting that he open a new account and get a new computer, Mr. Jablonski offered no advice after learning of the computer crash.

The respondent is assisted in his recordkeeping by an employee, whom he trained, and who has been so employed for about six years. As to her work and the respondent's supervision, the hearing court commented:

"Ms. Andrews enters financial information concerning the real estate settlements into Respondent's computer and prepares the documents for settlement. Respondent would also make these entries. It was not Ms. Andrews' job to back up the computer data. Ms. Andrews prepared monthly Reconciliation Reports for Respondent's attorney trust account. She would discuss these reports with Respondent. The April, May, June, and December 2002 reports reflect a shortfall in the trust accounts.

"Ms. Andrews testified that lending banks made errors. They would indicate that they were sending one amount, and then send another. Although Respondent's office is no longer depositing funds into trust account number 9983, the account still has a balance of approximately $5,000.00. Ms. Andrews started getting the account cleared up about a year ago and is still working on disbursing those funds to the rightful owners."

(Record references omitted).

With respect to the allegations concerning the respondent's practice in the Orphans' Court, the hearing court found:

"Respondent failed to timely file inventories and accountings with the Orphans' Court for Anne Arundel County for the Estates of Arthur, Raymond and Vivian Heiss. For the Estates of Raymond and Vivian Heiss, Respondent failed to timely file information reports. Respondent told Biennas [the petitioner's investigator] that the Orphans' Court routinely issues Show Cause Orders to show that it is time to file the necessary documents."

(Record references omitted). The court also confirmed that the respondent obtained a commission, in the amount of $2,940.00, from the Orphans' Court for acting as special administrator of the Estate of Arthur Heiss, which he collected, but returned when John and Wilda Heiss, believing that the $10,000.00 fee previously paid to the respondent compensated him for all of his work in the Heiss matter, objected. The hearing court found, however, that "[i]t was Respondent's understanding that his $10,000.00 fee did not cover the Heiss estate work. The terms of the Heiss settlement agreement state that the $10,000.00 is to cover Respondent's resolution of the title issues; there is no mention of a fee for estate work. Therefore, Respondent applied for a commission in the Estate of Arthur Heiss."

On these findings of fact, the hearing court concluded that the respondent violated Rules 1.1, 1.3, 1.15(a) and (d), 8.1(b), 8.4(d) of the Rules of Professional Conduct and Maryland Code (2000, 2004 Repl.Vol., 2006 Supp.) § 10–306 of the Business Occupations and Professions Article. It also concluded that the respondent was practicing law when he engaged in this misconduct. On the other hand, the hearing court declined to find violations of Rules of Professional Conduct 5.3(b), 8.1(a) and 8.4(c) and Maryland Rule 16–609, stating that "[t]here is not clear and convincing evidence that Respondent violated" them.

Whether the respondent was practicing law was required to be considered when the respondent moved to dismiss the Petition for Disciplinary or Remedial Action on the basis that "he was not practicing law" when the charged rule violations occurred. The respondent relied on *Attorney Grievance Comm'n v. Lichtenberg*, 379 Md. 335, 842 A.2d 11 (2004) and *Attorney Grievance Comm'n v. Davis*, 379 Md. 361, 842 A.2d 26 (2004), in both of which this Court dismissed the disciplinary petition, holding:

"Where the basis of Bar Counsel's complaint relates to conduct not connected with the practice of law, it would be inappropriate for this Court to determine in the first instance if respondent violated the Insurance Article, and

then to impose sanctions with respect to his license to practice law, particularly where the [Insurance] Commissioner was aware of the conduct and declined to exercise his authority to regulate respondent's conduct as an agent or broker."

*Lichtenberg,* 379 Md. at 356, 842 A.2d at 23. *See Davis,* 379 Md. at 376, 842 A.2d at 35 (indicating that the case was being dismissed for the reasons stated in *Lichtenberg* ). We also held in *Lichtenberg* that the respondent in that case had not violated Rule 1.15(a) of the Rules of Professional Conduct, his conduct in that regard not having been in connection with the legal representation of a client. 379 Md. at 358, 842 A.2d at 24. The respondent deduced from these propositions, and therefore argued, that a person acting as an insurance agent is not practicing law and from that proposition, he concludes that activities of title insurance agents are not subject to the MRPC or to the IOLTA (Income on Lawyers' Trust Accounts) rules.

Rejecting this argument, the hearing court distinguished *Lichtenberg* and *Davis* from the case *sub judice.* It explained:

"*Lichtenberg* is distinguishable from the case at hand because the Court found that Lichtenberg did "not engage in the active practice of law but instead was acting as a title agent whose main business activity is to conduct real estate settlements...." [379 Md.] at 353[, 842 A.2d at 22]. Similarly, the respondent in *Davis* was not practicing law during the relevant events, he was engaging in title insurance work; the Commission did not allege that the respondent improperly handled the trust account used in his legal practice, it alleged only that respondent's title insurance company was improperly retaining the benefit of the interest earned in the "sweep accounts." *Davis,* 379 Md. at 366[, 842 A.2d at 29]. In this case, while Respondent is a title agent, Respondent was practicing law during the relevant events. He had to open and administer three estates and, unlike the *Lichtenberg* case, he maintained the settlement

funds in an attorney trust account rather than in a Maryland Affordable Housing Trust (MAHT)."

Having concluded that the respondent was practicing law, the hearing court turned to the merits of the charged rule violations. Having reviewed how this Court has interpreted Rule 1.1, *see Attorney Grievance Comm'n v. Guida*, 391 Md. 33, 54, 891 A.2d 1085, 1097 (2006) ("Evidence of a failure to apply the requisite thoroughness and/or preparation in representing a client is sufficient alone to support a violation of Rule 1.1."); *Attorney Grievance Comm'n v. Ober*, 350 Md. 616, 630, 714 A.2d 856, 863 (1998) ("[T]horoughness and preparation reasonably necessary for competent representation includes the proper management of case files"), the hearing court found that "the combination of Respondent's lackadaisical handling of trust funds, his unreliable recordkeeping system, his failure to routinely back up his computer, and his lack of urgency in correcting the errors once discovered rise to the level of incompetent representation." With respect to the handling of the trust account, relying on *Attorney Grievance Comm'n v. Brown*, 380 Md. 661, 667–68, 846 A.2d 428, 431 (2004) and *Attorney Grievance Comm'n v. Maignan*, 390 Md. 287, 296–97, 888 A.2d 344, 349 (2005) (unintentional conduct does nor negate incompetence), it concluded, more particularity, that "[f]ailure to properly maintain a client's settlement monies in an escrow account may also demonstrate incompetence under MRPC 1.1." The respondent's incompetence was reflected, the court said, in his distribution, in the Heiss settlement, of $1,256.87 more than he collected and in his giving Mark Heiss $12,978.00 more than he was due.[16]

---

16. As explained by the hearing court:
    "Respondent paid Mark Heiss $20,000.00 for maintenance expenses on May 15, 2002 and then advanced Mark Heiss $65,000.00 from the Estate of Vivian Pauline Heiss just five days later. However, Respondent miscalculated the advance because he included the $20,000.00; he forgot that he had already paid Mark Heiss $20,000.00 just five days before."
    (Record references omitted).

The court noted particularly the respondent's failure promptly to disburse the money owed to the Arthur Heiss Estate, citing *Attorney Grievance Com'n v. Zuckerman,* 386 Md. 341, 369, 872 A.2d 693, 709 (2005) and observing that 13 to 14 months elapsed before the funds were delivered and that the delay was not lost on the Orphans' Court, which scheduled a show cause hearing to consider the reason for the respondent's failure to file the Inventory and First Administration Account.[17] It also observed:

"Respondent was not well prepared to handle the complexities of the estate work. Respondent explained that his delay was, in part, due to the fact that he had to consult with the Anne Arundel County Register of Wills office, he had a problem calculating taxes, he had mistakenly attempted to probate in Alabama, and he was not sure whether the old rules or the new rules applied to the Estate of Arthur Heiss because he had passed away in 1963. While these deficiencies alone may not rise to the level of incompetence, this Court finds that when considered in totality and as Respondent's explanation for the 13 to 14 month delay, they provide clear and convincing evidence that Respondent failed to provide competent representation."

(Record references omitted).

The hearing court determined that the respondent did not act with reasonable diligence and promptness in the representation of any one of his three estate clients: the estates of Arthur Heiss, Raymond Heiss and Vivian Pauline Heiss. In each, the administration accounts were not filed when due and, in fact, were not filed until after a show cause order regarding the failure to file had been issued and, then, well after the return date. Moreover, in none of the cases is there an

---

17. The respondent did not appear at the show cause hearing, but he did make the subject filings, albeit almost two months thereafter.

The hearing court also made note of the fact that "[t]here was no evidence in the Orphans' Court file explaining the reason for the Respondent's delay other than a June 18, 2003 letter mentioning that Respondent had discussed a week-long extension with the judges."

explanation for the delay. In the Arthur Heiss matter and the Vivian Pauline Heiss matter, the respondent did not appear at the Show Cause hearing. Although addressing the Arthur Heiss Estate, the hearing court made the point: "Respondent apologizes for not appearing at the Show Cause hearing on June 12, 2003, however, Respondent provides no explanation for the delay in filing the required documents."

The basis for the Rule 1.15(a) violation was twofold: "[o]n at least three occasions, Respondent disbursed funds to clients before their settlement checks were deposited," citing *Zuckerman*, 386 Md. at 372, 872 A.2d at 711, and the respondent "failed to preserve complete and accurate records for his account funds," a proposition with which the respondent agrees, at least insofar as the "record of the Heiss receipts and disbursements" is concerned. As to the latter, the respondent's computer crashes are a significant consideration:

"... Respondent backed up his computer in December 2001.... [A] software crash occurred in April 2002. Even though Respondent lost data and suffered this crash, he failed to back up his computer for another year. Respondent explained in testimony that he did not back up his computer after the crash in April 2002 because he did not know how accurate the information was on his system. Respondent said that he did not back up the server more frequently because it had to be done when no one was using the computers, it took about four hours to perform, and someone had to be present to switch the tapes, so it could not occur during work hours. Even if true, this Court finds that this rationale is inadequate. Respondent failed to adequately back up his computer records and, therefore, must bear some of the blame of the data lost due to the computer failures."

(Record references omitted).

The former was also the basis for the hearing court's conclusion that the respondent violated § 10–306 of the Busi-

ness, Occupations & Professions Article. It reasoned in that regard:

> "The evidence established that it was Respondent's practice to conduct settlements prior to depositing the funds for those settlements and that Respondent knew that there were times that the checks he disbursed at settlement would be negotiated before he deposited the checks to fund the settlement. In one instance, it was more than five weeks between the disbursement of more than $200,000.00 and the deposit of the corresponding funds. Respondent was therefore aware that funds for other settlements were being disbursed to pay the checks in settlement where the deposits were delayed. This conduct provides clear and convincing evidence that § 10–306 was violated."

As with the Rule 1.15(a) violation, the hearing court relied on *Zuckerman*, 386 Md. at 372, 872 A.2d at 711.

The hearing court found a violation of Rule 1.15(d) by virtue of the respondent's failure to respond to inquiries (a minimum of four, by telephone, e-mail and letter) made by attorneys representing persons interested in the Arthur Heiss Estate or the Estate of Helen Peters, through that estate. In so doing, the court rejected the respondent's defense that he did not believe that he was obligated to speak with those attorneys because their clients were not, so far as he believed, "interested parties to the Estate of Arthur Heiss." It reasoned: a letter from one of the attorneys described his clients as persons interested in the Helen Peters Estate, which the respondent had listed as an interested person in the estate papers he filed; "for purposes of resolving the title issues concerning the properties, John and Wilda Heiss were Respondent's clients" and the attorney's letter indicated that it was in connection with those issues that the respondent had been hired to represent their clients. Finally, the hearing court concluded that the delay in distributing the funds owed to the Estate of Helen Peters was itself a violation of Rule 1.15(d).

> "There is clear and convincing evidence that Respondent

violated MRPC 8.1(b)," the hearing court concluded.[18] This was shown, it said, by the several requests, made of the respondent by Bar Counsel, for information concerning the Heiss matter and the overdrafts in his trust account that the bank reported, to which the respondent either failed to respond altogether or to do so timely. That the respondent provided the requested information eventually did not, it asserted, excuse the violation that untimely response constituted. Moreover, the hearing court continued, Bar Counsel's requests, which this Court has made clear are "lawful demands," *see Attorney Grievance Com'n v. Fezell,* 361 Md. 234, 250, 760 A.2d 1108, 1116 (2000), were read by the respondent, who "was also aware that he was not responding and ... that failure to respond was a violation of MRPC 8.1." Nor was the hearing court persuaded by the respondent's efforts, detailed in testimony, to comply or his contention that "often Bar Counsel asked for voluminous material," making compliance in the time allotted impossible. It pointed out in that regard that the respondent "never asked for an extension of time to provide the records and never wrote or called to say that he did not have the requested records."

The hearing court found that, in violation of Rule 8.4(d), the respondent engaged in conduct prejudicial to the administration of justice, "conduct [that] reflects negatively on the legal profession and sets a bad example for the public at large":

"Respondent ignored efforts of opposing counsel to obtain an accounting for the Heiss trust funds. If Respondent believed that Schaffer's and Obrecht's clients were not entitled to an accounting, he should have so advised them. Ignoring Schaffer's and Obrecht's communications between

---

18. The petitioner also argued that, by failing to mention in his explanation of the overdrafts that he had twice disbursed approximately $ 374,-000.00 to pay off a mortgage holder, a fact of which he was aware when his response was made, the respondent violated Rule 8.1(b), because he thereby did not correct Bar Counsel's misapprehension regarding the cause of the overdrafts. The hearing court was not persuaded that the petitioner had proven this violation.

January and July 2003 caused John Heiss to incur unnecessary legal expenses.

"Respondent engaged in conduct prejudicial to the administration of justice when he failed to respond to demands for information from Bar Counsel in a timely manner and when his statements to Bar Counsel were not accurate.

"Respondent engaged in conduct prejudicial to the administration of justice when he failed to file timely Inventories, Information Reports and First and Final Administrative Accounts in the Heiss Estates."

Although it makes no recommendation, the hearing court offers factors in mitigation for the Court to consider when fashioning the appropriate sanction: the personal commitments of the respondent with regard to the marriage of both his son and his daughter weeks apart in 2004 account, in part, for the failure to respond to Bar Counsel's information requests, and the respondent's computer crashes, over which he had no control, preclude the respondent from providing the complete records requested by Bar Counsel. In addition,[19] it notes the respondent's lack of a prior disciplinary history, the fact that the respondent derived no personal benefit from his misuse of funds and that "[a]lthough the banks sent overdraft notices, there is no evidence that the banks ever refused to pay a check because no one complained to him that the checks had not been paid."

---

19. While included in the "Mitigation" section, by its terms, it is clear that the following was not advocated by the hearing court:

"Respondent would have the Court consider the motive behind the attorney grievance complaint. He states that it is ironic that John and Wilda Heiss waited for so many years after the Heiss brothers' deaths in 1960, 1963 and 1975 to attempt to resolve the ownership of the property involved, yet could not wait thirteen months for the disbursement of the funds owed to the Estate of Helen Peters. 'Any alleged delay in resolving the title issues concerning the Anne Arundel County Heiss properties should be laid at the feet of those to whom it belongs, the Heiss family members who were the respective survivors of the three Heiss brothers, but who did nothing to resolve patent title problems and certainly should not be sought to be attributed to respondent.' "

This is also one of the respondent's exceptions.

Both the petitioner and the respondent filed exceptions, *see* Maryland Rule 16–758,[20] the petitioner to certain of the hearing court's conclusions of law, i.e. the Rule 1.15(d) violation and the failure to find a violation of Rule 16–609, and the respondent to both findings of fact and conclusions of law. Both also filed recommendations for sanctions. The petitioner urges the Court to suspend the respondent indefinitely from the practice of law. Not unexpectedly, the respondent has a far different recommendation; if the Court does not dismiss the disciplinary action, he recommends a reprimand.

The petitioner's Rule 1.15(d) exception relates to changes to the Rule since the misconduct occurred. The conduct occurred in 2003 and in 2004. At that time, the petitioner points out, what is now Rule 1.15(d) was Rule 1.15(b). Consequently, it submits, the conclusion of law should be that the respondent violated Rule 1.15(b). The gravamen of the petitioner's exception regarding Rule 16–609 is that "[t]he same evidence which supports Judge Jaklitsch's finding that Respondent used trust funds for purposes other than the purposes entrusted in violation of Bus. Occ. & Prof. Article § 10–306 supports the finding that Respondent used trust funds for unauthorized purposes in violation of MRPC 16–609." Noting that Rule 16–609 prohibits the use of funds required to be deposited in an attorney trust account, it submits that the findings that the respondent disbursed, in connection with settlements, funds on deposit from earlier settlements, knowing that the funds for those settlements had not been deposited and that the respondent overpaid his client by more than $ 12, 000.00 were sufficient to establish a violation of that Rule. It is not necessary, the petitioner argues, that it show, as the hearing court determined, that the respondent benefitted or gained from the unauthorized purpose.

---

20. Maryland Rule 16–758 provides, in pertinent part:

"(b) Exceptions; recommendations. Within 15 days after service of the notice required by section (a) of this Rule, each party may file (1) exceptions to the findings and conclusions of the hearing judge and (2) recommendations concerning the appropriate disposition under Rule 16–759(c)."

The respondent filed seven exceptions to the hearing court's findings of fact and conclusions of law. The first challenged the court's threshold conclusion that the conduct constituting the Rules violations occurred while the respondent was engaged in the practice of law. As he did in the hearing court, the respondent argues that, because he is a real estate title insurance agent, a pursuit, he maintains, in which he was engaged when the charged violations occurred and which this Court has held is not the practice of law, he is subject "to the regulatory authority of the Insurance Commissioner," not the Maryland Rules of Professional Conduct. This Court, in other words, he asserts, has already spoken on the subject in *Lichtenberg* and *Davis*, making clear that "engaging in, functioning as or conducting the business of a real estate title insurance agent is not an activity constituting the practice of law and such activity hence is not controlled by or subject to the MRPC or statutes regulating the practice of law," thus insulating him from disciplinary proceedings, initiated by the petitioner, premised on those activities.

The respondent's second exception is to the various references the hearing court made with regard to time lapses between the distribution of settlement proceeds and the deposit in the respondent's trust account of the funds from which those proceeds were to be paid. He submits that "real estate settlement[ ] checks customarily are handed out at the settlement table, although funds for the disbursements involved frequently are not yet in hand or deposited, although [their] payment has been arranged." The "numerous references" in the findings and conclusions to the respondent's failure to meet the time requirements set by Bar Counsel are the next subject of the respondent's exceptions. In addition to noting his lack of input in setting the time requirement, he complains that

"no notice appears to have been taken of the time burden respondent already bore because of daily requirements incident to his title insurance business and his law practice, his efforts to recover an immense amount of data and records in the same time interval as well presented an insoluble prob-

lem which obliged respondent to do as much as he feasibly could to placate competing demands."

The respondent also points out that he responded to the requests, albeit not in the time prescribed.

The hearing court's references to the notices of overdrafts received by Bar Counsel are the next subject of the exceptions. The respondent argues that they are not consistent with the record, which is devoid of any "clear and convincing evidence" that those trust account checks that were the subject of those notices were not paid by the bank. He notes, in that regard, that, despite the fact that many of the checks were of a substantial amount, "there was no evidence of any irate payee's coming after respondent for a pound or more of flesh, or even politely pressing him for payment." He next excepts to the hearing court's references to his trust account checks being outstanding for more than 90 days and to his having been placed on the Title Company's "Significant Findings Report" on several occasions. As to the former, the respondent argues that 90 days outstanding is not "unusual." As to the latter, he maintains that the issues causing his placement on the list were promptly resolved.

Exception six relates to the adverse findings and conclusions regarding the Estate of Arthur Heiss. This exception highlights that the relatives interested in that Estate "did nothing to clarify the interests of Arthur Heiss for more than 40 years following his death in Alabama, yet now seek to complain about delay" and that the New Jersey attorney representing the Estate of Helen Peters, with whom he dealt, made no complaint as to the time delay. Therefore, the respondent "respectfully suggests that any censure concerning the history or handling of the that estate should be directed at those whose actions or lack of it warrant it, the relatives of Arthur Heiss who blithely ignored the estate for more than 40 years, but now seek to play the 'put the blame on Mame game" and point fingers at others, including [the respondent], readily disregarding that it was through [his efforts] that the estate was revived and whatever benefits may thereby accrue to them came as a result of his efforts."

The respondent's final exception is to the hearing court's conclusion that his representation in the Heiss matter was incompetent. He is particularly concerned by the characterization of his representation and actions, using terms such as "lackadaisical" and "unreliable," and referring to his failure to back up his computer and to correct discovered errors as "routine," and lacking urgency. He offers that none of the characterizations are warranted by the record and that he acted properly and diligently, within the context of his network and personal ability.

Maryland Rule 16–759(b) provides:

"(1) *Conclusions of Law.* The Court of Appeals shall review de novo the circuit court judge's conclusions of law.

"(2) *Findings of Fact.*

"(A) If No Exceptions Are Filed. If no exceptions are filed, the Court may treat the findings of fact as established for the purpose of determining appropriate sanctions, if any.

"(B) If Exceptions are filed. If exceptions are filed, the Court of Appeals shall determine whether the findings of fact have been proven by the requisite standard of proof set out in Rule 16–757(b). The Court may confine its review to the findings of fact challenged by the exceptions. The Court shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses."

Thus, we review *de novo* the hearing court's conclusions of law. Rule 16–759(b)(1); *Attorney Grievance Comm'n v. Mahone,* 398 Md. 257, 265–66, 920 A.2d 458, 463, 2007 WL 1051696, *4 (2007); *Attorney Grievance Comm'n v. Mba–Jonas,* 397 Md. 690, 700, 919 A.2d 669, 675, 2007 WL 816836, *4 (2007); *Attorney Grievance Comm'n v. Hodgson,* 396 Md. 1, 6–7, 912 A.2d 640, 644 (2006); *Attorney Grievance Comm'n v. McLaughlin,* 372 Md. 467, 493, 813 A.2d 1145, 1160 (2002); *Attorney Grievance Comm'n v. Joehl,* 335 Md. 83, 88, 642 A.2d 194, 196 (1994) (noting that the ultimate decision as to whether

an attorney has engaged in professional misconduct rests with this Court). When the factual findings are not clearly erroneous and the conclusions drawn from them are supported by the facts found, exceptions to conclusions of law will be overruled. *Mba–Jonas,* 397 Md. at 700, 919 A.2d at 675; *Attorney Grievance Comm'n v. Manger,* 396 Md. 134, 146–147, 913 A.2d 1, 8 (2006). Moreover, a hearing court's findings of fact will not be overruled unless we determine that they are clearly erroneous. *Mahone,* 398 Md. at 265, 920 A.2d at 463; *Guida,* 391 Md. at 50, 891 A.2d at 1095. "Weighing the credibility of witnesses and resolving any conflict in the evidence are tasks proper for the fact finder." *State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323, 331 (1998).

We shall overrule the respondent's exceptions. Exceptions three and seven challenge the correctness of the hearings court's findings of fact. On the other hand, exceptions two, four, five and six are more concerned with the effect of the findings on the respondent or others, with whether the respondent was benefitted or others were adversely impacted. None of the findings is clearly erroneous. Neither is the impact of any of them such that it undermines or negates their correctness.

We review exception one *de novo.* That review convinces us that the hearing court was correct, the misconduct that the respondent was found to have engaged in did occur while the respondent was practicing law. To be sure, as the hearing court found, the respondent is a title insurance agent, licensed by the State Insurance Commission and that approximately 80 percent of his business activity, and income, involve activities associated with that profession. On the other hand, his practice of law, which includes an estate practice and a commercial and residential real estate practice, consumes the remainder, or 20 percent of his business activity. The hearing court's findings that the respondent was retained to represent Mark Heiss in connection with his mother's estate is neither disputed nor clearly erroneous. Nor is it seriously contended that the expansion of the scope of the undertaking to include the sale and settlement of the Heiss real estate changed the

nature of the respondent's responsibilities. The hearing court concluded, we hold correctly, that the respondent was practicing law during the period when he was engaged in the Heiss matter. The real estate settlements he conducted in connection therewith were conducted not as a title insurance agent, but as an attorney.

This case is nothing at all like *Lichtenberg* and *Davis*. In neither of those cases was it contended, or even arguable, that the attorneys in those cases were practicing law. Indeed, in *Lichtenberg*, the Court clearly stated the context for its holding:

> "The heart of Bar Counsel's complaint against respondent boils down to one contention: that by depositing into his title insurance company's account the interest from funds entrusted to him by clients of the title insurance company, without the express consent of the 'beneficial owners,' respondent violated the Maryland Rules of Professional Conduct. Respondent does not engage in the active practice of law but instead was acting as a title agent whose main business activity is to conduct real estate settlements, which is governed pursuant to the Insurance Article of the Maryland Code, by the Commissioner of the Insurance Administration."

379 Md. at 353, 842 A.2d at 21. *Davis*, of course, involved the same issue. 379 Md. at 380, 842 A.2d at 37. At issue here is not the insurance company account, rather the respondent's escrow account. Also, here, the respondent undertook the representation of a client; that is not disputed and it was this representation that was the genesis of the issue, with the resolution of which the respondent was subsequently charged and which he was pursuing when the charged conduct occurred. If the respondent is correct, a title insurance agent who performs a settlement during the course of representing a client would never be able to be the subject of disciplinary proceedings, no matter how egregious the misconduct. We certainly did not create such a loophole.

The petitioner's exceptions are well-taken; consequently, we shall sustain them. The exception pertaining to Rule 1.15(d) is at best technical. Neither the petitioner nor the respondent is unclear as to the conduct of the respondent that the hearing court found to be violative of a Rule of Professional Conduct or the substance of the Rule that it found to have been violated. The rub is that, while the Rule as it exists today prohibits the conduct in which the respondent was found to have engaged, it does so in a different section than it did when the disciplinary petition was filed. Until 2005, the requirement that an attorney promptly notify persons with an interest in funds the attorney is holding in trust deliver those funds or give an accounting on request was codified in section (b) of the Rule. Now it is in subsection (d). Rather than the Rule in existence when the conduct occurred, the hearing court referenced the current Rule. That does not negate the violation. We agree with the petition that the hearing court should have found a violation of Rule 1.15(b).

▮ Rule 16–609, like § 10–306, proscribes the "use of any funds [required by these Rules to be deposited in an attorney trust account] for any unauthorized purpose." The hearing court found, we conclude, appropriately, a violation of the latter, but not the former. Because the statute and the Rule have the same requirement, we are at a loss as to why one, but not the other. As the petitioner points out, there is no requirement of personal gain or benefit accruing to the attorney contained in the Rule anymore than there is any such requirement in the statute. Accordingly, we sustain the petitioner's exception on this point.

▮ We turn to the determination of the appropriate sanction in this case. We do so fully cognizant that the purpose, and goal, of attorney discipline are to protect the public, not to punish the erring attorney, *Mba–Jonas,* 397 Md. at 703, 919 A.2d at 677; *Attorney Grievance Comm'n v. Rees,* 396 Md. 248, 254, 913 A.2d 68, 72 (2006), which are achieved "when the sanctions are commensurate with the nature and gravity of the violations and the intent with which they were

committed." *Attorney Grievance Comm'n v. Stein,* 373 Md. 531, 533, 819 A.2d 372, 375 (2003).

██ The petitioner recommends an indefinite suspension from the practice of law. It does so based on the nature and severity, as well as the number of the charges. The respondent, as we have seen, believes that disciplinary proceedings are not appropriate at all. Thus, he argues that the proceedings should be dismissed without any sanction. If, however, there is to be a sanction, he suggests a reprimand will suffice and, at worst, a thirty day suspension. We share the petitioner's concern regarding the protection of the public, our paramount objective, given the nature of the charges and the respondent's response when confronted with issues and problems. While we accept the mitigating factors the hearing court identified, we are not particularly comforted. That the respondent did not benefit from the Rule violations does not negate their occurrence or his culpability. Nor does the fact that no one, other than the beneficiaries of the Estate of Arthur Heiss, was adversely impacted. Putting family first is commendable, of course, but under certain circumstances, as for example the present one, it may highlight the inadequacy of the response and confirm the court's conclusion that it lacks sufficient urgency. While a computer crash may not be able to be avoided, the respondent's failure to back up the data regularly and his explanation for not doing so is troubling, if not telling. We believe, under the circumstances, that the petitioner's recommended sanction is the appropriate one. The respondent is ordered indefinitely suspended from the practice of law. He may reapply for readmission 60 days after the date of this Court's order of suspension.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST RANDALL E. GOFF.