884 A.2d 104

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Virgil Duane PARKER.**

**Misc. Docket AG No. 26, Sept. Term, 2004.**

Court of Appeals of Maryland.

Oct. 4, 2005.

Glenn M. Grossman, Deputy Bar Counsel (Melvin Hirshman, Bar Counsel, Attorney Grievance Commission of Maryland), for petitioner.

Peter F. Axelrad of Council, Baradel, Kosmerl & Nolan, P.A., Annapolis, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

The Attorney Grievance Commission, through Bar Counsel and in conformance with Maryland Rule 16–751, filed a Petition for Disciplinary or Remedial Action against respondent, Virgil Duane Parker, alleging violations of Maryland Rules of Professional Conduct (MRPC) 1.4(b), 1.5(a) and (b), 1.7(b), 1.8(a), and 8.4(b), (c), and (d). We referred the petition to Judge Michael Loney, of the Circuit Court for Anne Arundel County, to conduct a hearing and submit to this Court his proposed findings of fact and conclusions of law.

Judge Loney conducted a hearing and, on March 2, 2005, submitted his findings and conclusions. He concluded that respondent had violated MRPC 1.5(a) and 1.8(a)(2), made no finding as to MRPC 1.7, and concluded that respondent had not violated the other MRPC provisions alleged by Bar Counsel. Bar Counsel excepts to Judge Loney's failure to find violations of MRPC 1.4(b), 1.8(a)(1), 1.7(b), and 8.4(c) and (d). Respondent excepts to the judge's finding of a violation of MRPC 1.8(a)(2).

### BACKGROUND

Respondent was admitted to the Maryland Bar in 1985 and to the Tennessee Bar in 1993. He is presently on a voluntary inactive status in Tennessee, where he now resides. Prior to

moving to Tennessee, he practiced law and operated a real estate brokerage firm in Easton, Maryland. For a time, he served as counsel to the town Planning and Zoning Commission and handled real estate and contract matters for the Commission. He was regarded by colleagues who testified in his favor as being "very organized," having a "good knowledge about his cases," and being "a Nervous Nellie when it came to doing things the right way."

Commencing in 1993, respondent provided a variety of legal services to Reverend and Mrs. G. David McPeake, an elderly couple who, at the time, lived in Cambridge. The matter before us concerns his representation of the McPeakes in connection with the sale of a farm owned by them in Jackson, Tennessee. Respondent began advising the McPeakes with respect to the matter in June, 1993. Indeed, that was the initial purpose of his representation. His written agreement with them was to charge $100 an hour for his services, and he billed them at that rate in June, 1993 and in June through December of 1998. There were no billings between June, 1993 and June, 1998, because there was little or no activity regarding the farm. In October, 1998, when efforts to sell the farm recommenced, the McPeakes, upon respondent's suggestion, entered into a management contract with First American National Bank in Tennessee to manage the property until sold. Under that agreement, which respondent had, in part, negotiated with the bank, the bank was entitled to a fee of 5% of the gross sale price of the property. At about that same time, according to respondent, he and the McPeakes orally agreed that, in place of his hourly charges, he, too, would receive a fee equivalent to a 5% commission on the sale of the property. Notwithstanding that oral modification, respondent continued to bill the McPeakes on an hourly basis for legal services through April, 2002.[1] He explained that the arrangement somehow reverted to hourly billing after July, 1999.

---

1. In June, 1993, respondent billed the McPeakes $485, including $350 for the preparation of a contract of sale. No charges were made afterward until May, 1998, when he charged $595 for various meeting

The farm, consisting of between 70 and 100 acres of basically raw land, was sold in three parcels—the first in July, 1999, for $325,000; a second in January, 2001, for $311,125; and the third in January, 2002, for $325,000. All commissions or fees based on the total sales price were paid when the first parcel was sold in July, 1999. The Department of Housing and Urban Development (HUD) Settlement Sheet for that sale shows, as a Settlement Charge to the Seller, $48,056 paid to the bank. That charge represents 5% of the aggregate $961,125 purchase price for all three parcels. Nothing is shown on the settlement sheet as being paid to respondent. Nonetheless, on July 7, 1999, McPeake sent respondent a check for $49,477, representing an equal 5% commission on the entire $961,125 plus $1,420.75 in travel expenses charged by respondent. The HUD Settlement Sheets for the sales of the other two parcels show no commissions or fees paid to either the bank or to respondent.

After the sale of the first parcel, respondent and the McPeakes discussed the prospect of the McPeakes lending $70,000 to respondent, to help finance the purchase of property in Tennessee, where respondent intended to relocate. The loan was to be secured by a mortgage on property in Talbot County, Maryland owned by respondent and his wife. Respondent suggested that McPeake speak with a mutual friend, Harold Robbins, who was the President of the Bank of the Eastern Shore. Robbins was never made aware of the purpose or terms of the proposed loan, but he did attest to respondent's trustworthiness and advised the McPeakes about current interest rates. Respondent did not advise the McPeakes to seek independent legal counsel regarding the prospective loan.

---

and teleconference calls relating to the sale of the farm. In June, 1998, he billed at least $437 for similar services; in October, 1998, he billed $376; in November, he billed $96; and in December, another $52.50. In August, 1999, after the sale of the first parcel, he billed $428 for conference calls and meetings relating to the sale of the farm; in April, 2000, he billed $1,172; for services rendered in September, 2001 and January, 2002, he billed $2,467 plus over $1,300 in expenses. His last billing for services related to the sale was in April, 2002.

In October, 2000, the loan was made. Respondent borrowed $70,000 at 8% annual interest. Respondent prepared the mortgage intended to secure the loan. Although he was an experienced real estate attorney and knew that the property was owned by himself and his wife, as tenants by the entireties, respondent neglected (1) to include in the mortgage a description of the property or even a reference to the liber and folio where the deed by which he and his wife obtained the property was recorded, or (2) to include his wife as a borrower or have her sign the mortgage.[2] The mortgage thus provided no security at all for the loan. He gave the mortgage, in its defective form, to McPeake. It was never recorded. The mortgage, which presumably recited the terms of the loan, obligated respondent to repay the loan in equal monthly installments of $510.23, beginning November 2, 2000, and continuing until November 1, 2002, at which time the balance would be due. Respondent made none of the monthly payments.

In January, 2002, following settlement on the final parcel, of the McPeake Tennessee farm respondent prepared a Statement of Mortgage showing a full discharge of the mortgage on the Talbot County property. The Statement showed payments as follows:

| | |
|---|---|
| Date of Loan: 10/02/00 | $70,000 |
| Payment applied to principal: 01/01/01 | -$31,113 |
| Payment applied to interest: 10/02/00-03/31/01 | $ 2,400 |
| Balance on Mortgage: 04/01/01 | $38,887 |
| Interest Accrued to 12/31/01 | +$ 2,462 |
| Balance Outstanding 12/31/01 | $41,349 |
| Payment applied to Principal: 12/31/01 | -$32,500 |
| Payment applied to Principal: 12/31/01 | -$ 6,387 |
| Payment applied to Interest: 12/31/01 | $ 2,462 |
| Interest paid on Loan: 12/31/01 | $ 8,849 |
| Balance on Mortgage: 12/31/01 | 0 |

None of those payments, of interest or principal, were made by respondent. The $31,113 and the $32,500 represented

---

**2.** Respondent's secretary later typed in a liber and folio reference on a copy of the mortgage, which was presented to Bar Counsel, but the original that was given to McPeake showed that reference as blank.

commission/fees of 10% on the purchase prices for the second and third parcels ($311,125 and $325,000, respectively) of the McPeakes' farm and the other amounts represented what respondent believed were legal fees or expenses in connection with other work done for the McPeakes. There is no explanation in the record of why respondent was entitled to anything more from the sale of the last two parcels, his having already received 5% of the entire $961,125 purchase price and his having continued to bill the McPeakes at an hourly rate for services related to the sales, or why, if he was entitled to any additional percentage fee based on those sales, it would be 10% rather than 5%. Respondent advised the McPeakes that the mortgage had been discharged and sent a copy of the Statement to their accountant.

Notwithstanding respondent's prior crediting of the $63,613 against his mortgage debt, in August, 2002—eight months later—respondent requested and McPeake sent two checks to Parker Realty, respondent's real estate company, in the amounts of $31,113 and $32,500, respectively—a total of $63,613. McPeake referred to the checks as "Commissions" paid on the respective sales prices. Respondent deposited the two checks. On the same day, he sent a check for $70,000 to McPeake, to "memorialize" the fact that he had paid the mortgage, and had the McPeakes sign a release of the mortgage, which was discussed in respondent's testimony but which we cannot locate in the record.

All of this began to unravel when respondent sent McPeake's accountant a copy of his Mortgage Statement showing an interest payment in 2001 of $8,849. The accountant included that amount as income on the McPeakes' 2001 Federal Income Tax Return. The McPeakes' daughter, knowing that her parents had not received such a payment, questioned the amount and consulted counsel, who eventually filed suit against respondent and made a complaint to Bar Counsel. At that point, respondent acknowledged that he was not entitled to the $63,613, and he repaid that amount to McPeake, from the Parker Realty account, along with interest on the

$70,000 and interest on the $63,613 at the rate of 8% per annum.

## DISCUSSION

In proceedings involving attorney discipline, this Court has original and complete jurisdiction, and, although, in conformance with Maryland Rule 16–752, we traditionally refer petitions to a Circuit Court judge to convene a hearing and present to us proposed findings of fact and conclusions of law, we conduct an independent review of the record and draw our own conclusions. *See Attorney Grievance Comm'n v. Zuckerman,* 386 Md. 341, 363, 872 A.2d 693, 706 (2005). We ordinarily accept the hearing judge's findings of fact unless we determine that they are clearly erroneous. *Attorney Grievance Comm'n v. Gore,* 380 Md. 455, 468, 845 A.2d 1204, 1211 (2004). As to conclusions of law—whether provisions of MRPC were violated—however, our consideration is essentially *de novo. Attorney Grievance Comm'n v. Cherry–Mahoi,* 388 Md. 124, 152, 879 A.2d 58, 76 (2005); *Attorney Grievance Comm'n v. McLaughlin,* 372 Md. 467, 483, 813 A.2d 1145, 1160 (2002).

The first violation alleged by Bar Counsel was of MRPC 1.4(b), which requires that a lawyer "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Judge Loney, finding that the McPeakes were "well-informed as to the nature of Respondent's representation" and "were also kept informed of the many professional services Respondent performed," concluded that respondent had not violated that Rule. In his exception, Bar Counsel notes respondent's failure to disclose that the supposed security on the $70,000 loan was a sham, that he was not entitled to the $63,613 that he effectively received twice, once by crediting it against the mortgage debt and once by actually requesting, receiving, and depositing checks in that amount, and by the "specious" nature of his explanation for how the loan was repaid.

We sustain that exception. The $70,000 loan was part and parcel of the representation. It was to be secured by a valid mortgage on property owned by respondent and his wife, and the McPeakes obviously relied on respondent to assure that was done. Instead, respondent, an experienced real estate lawyer, prepared a mortgage that contained no description of the property, did not reveal his wife as a party, and was not signed by his wife. The mortgage was a sham. Not only was it substantively deficient, but it was never intended by respondent to be honored. None of the monthly payments were ever made; instead, from the beginning, he intended to repay the loan and attempted to repay the loan from commissions to which he had no entitlement and has since acknowledged he had no entitlement. That was unquestionably a failure to explain a matter to the extent reasonably necessary to allow the McPeakes to make an informed decision regarding the representation.

■ The second violation charged by Bar Counsel was of MRPC 1.5(a) and (b). Rule 1.5(a) requires that a lawyer's fee be "reasonable" and sets forth various factors to be considered in determining reasonableness. Section (b) requires that, when a lawyer has not regularly represented a client, "the basis or rate of the fee be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation." Judge Loney found that respondent's taking of a fee in the amount of $49,477—the 5% commission on the sale of the three parcels—was not unreasonable in light of the complexities involved in the transaction. His acceptance of the $63,613 that he was not entitled to, however, did constitute a violation of MRPC 1.5(a). As to section (b), Judge Loney concluded that, because respondent had represented the McPeakes for approximately five years before the sale of the farm, he was not required to put the fee agreement in writing. Bar Counsel does not except to that finding, so we choose not to review it. We do note, however, that, although the sale of the farm in 1998 actually occurred five years after the representation commenced, and other work was done by respondent for the McPeakes during the

interim, it was the sale of the farm that brought the McPeakes to respondent in 1993 and was the first matter he dealt with for them.

The third charge by Bar Counsel was the violation of MRPC 1.7(b) which, in relevant part, precludes a lawyer from representing a client if the representation may be materially limited by the lawyer's own interests unless the lawyer reasonably believes that the representation will not be adversely affected and the client consents after consultation. That was coupled with a charged violation of MRPC 1.8(a), which prohibits a lawyer from entering into a financial or property transaction with a client unless the transaction is fair and equitable to the client (1.8(a)(1)) and the client is advised to seek the advice of "independent counsel" in the transaction and is given a reasonable opportunity to do so (1.8(a)(2)). Judge Loney found that respondent violated MRPC 1.8(a)(2) by failing to advise the McPeakes to seek independent counsel before entering into the loan transaction, but he made no finding with respect to MRPC 1.7(b). Respondent excepts to the finding of a violation of MRPC 1.8(a)(2) and Bar Counsel excepts to the lack of a finding that MRPC 1.7(b) and 1.8(a)(1) were violated.

Respondent's exception has no merit whatever. He argues that respondent did suggest that the McPeakes consult their mutual friend, who was president of the Bank of the Eastern Shore, and that sufficed to satisfy the Rule. The Rule, he urges, does not require that the independent "counsel" be a lawyer; a banker will do. That is not the case. We need not consider here whether, in situations where non-legal advice would be important to assure that the client can make an informed decision regarding the proposed transaction, the Rule may require a lawyer to suggest that the client consult someone capable of giving that advice—an accountant, an insurance professional, for example. Unquestionably, the Rule requires, at a minimum, that the lawyer suggest seeking

independent legal advice from a lawyer.[3] That was especially critical in this case. A competent independent lawyer would never have permitted the transaction to proceed as it did, with an ineffective, unrecorded mortgage that failed to provide the promised security for the loan.

As to the MRPC 1.7(b) violation, Bar Counsel argues that respondent's receipt of the $63,613, to which he was not entitled, amounted to his placing his interest above that of his clients and that "[a]ny consultation that the client received from the Respondent could not have been effective." It is not clear, however, that there were any consultations of note after respondent received the two checks in August, 2002. If this were the only charged violation or if it were important to the outcome of this matter, we would address it in greater detail. In the circumstance, we shall overrule the exception. Bar Counsel's exception to the failure to find a violation of MRPC 1.8(a)(1) is sustained. The transaction was grossly unfair to the McPeakes.

The last set of charges made by Bar Counsel were the violation of MRPC 8.4(b), (c), and (d), which, respectively, declare it to be misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects," to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation," or to "engage in conduct that is prejudicial to the administration of justice." Judge Loney found no violation of those Rules. He treated the receipt of the $63,613 by respondent as simply a mistake that, when brought to respondent's attention, respondent immediately corrected by returning the sum with interest. Judge Loney was also impressed with the witnesses who testified as to respondent's good character. Bar Counsel has not challenged the finding under MRPC 8.4(b) but has excepted to Judge Loney's findings and conclu-

---

3. That requirement is now explicit. In the revised MRPC that we adopted effective July 1, 2005, Rule 1.8(a)(2) specifies that the client be advised *in writing* of the desirability of seeking the advice of "independent *legal* counsel." (Emphasis added).

sions as they relate to MRPC 8.4(c) and (d). Bar Counsel does not regard what occurred as simply a "mistake." Nor do we.

Whether or not the McPeakes might have been willing to lend respondent the $70,000 on an unsecured basis, as respondent suggested, that was not the arrangement to which they agreed. The loan was to be secured by a mortgage on property owned by respondent and his wife as tenants by the entireties. It cannot have been a mere "mistake" for respondent, an experienced real estate lawyer with his own brokerage firm, to prepare a mortgage that was wholly ineffective. It cannot have been a mere mistake for respondent, in January, 2002, to apply against the principal of the loan (and the ineffectual mortgage) the $63,613 to which he had absolutely no entitlement. Even if we accept that there was an oral modification of the fee arrangement that entitled respondent to the equivalent of a 5% commission on the sale price of the property, that amounted to only $48,056, which, together with his travel expenses, he received when the first parcel was sold. There was no basis upon which respondent, even mistakenly, could have believed that he was entitled to an additional $63,613, even once, much less twice. Had the McPeakes' daughter not launched an investigation, leading to the discovery of what had occurred, respondent would have enriched himself, at his elderly clients' expense, by at least $63,613. Whether that conduct constitutes a criminal act for purposes of MRPC 8.4(b) we need not decide here, as Bar Counsel has filed no exception to Judge Loney's ruling in that regard. It clearly constitutes a violation of 8.4(c) and (d), however, and, to that extent, we sustain Bar Counsel's exception.

■■■ As we indicated in *Attorney Grievance Comm'n v. Culver*, 381 Md. 241, 283–84, 849 A.2d 423, 448–49 (2004), the purpose of sanctioning a lawyer for violation of MRPC is to protect the public, not to punish the attorney, and the severity of the sanction normally depends on the circumstances of each case—the nature and effect of the violations. We recounted in *Culver* what we had said in *Attorney Grievance Comm'n v.*

*Goldsborough,* 330 Md. 342, 364, 624 A.2d 503, 514 (1993), that "[t]he attorney-client relationship is based on trust, with the client necessarily placing total trust in the attorney and the attorney pledging to act in the client's best interest." *Culver,* 381 Md. at 285, 849 A.2d at 449.

It is clear from our analysis that respondent's conduct was laced with dishonesty and breach of trust. The only appropriate sanction is disbarment.

**IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–515(c), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST VIRGIL DUANE PARKER.**