981 A.2d 621

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Brian Grayson WEST.

Misc. Docket AG No. 67, Sept. Term, 2007.

Court of Appeals of Maryland.

Oct. 6, 2009.

**4**

Dolores O. Ridgell, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel, Atty. Grievance Com'n of Maryland), for Petitioner.

No argument on behalf of the Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, and BARBERA, JJ.

BELL, C.J.

The Attorney Grievance Commission of Maryland, the petitioner, by Bar Counsel, acting pursuant to Maryland Rule 16–751,[1] filed a Petition For Disciplinary or Remedial Action[2] against Brian Grayson West, the respondent. The petition charged that the respondent violated Rules 1.8, Conflict of Interest: Current Clients: Specific Rules,[3] 1.15, Safekeeping

---

1. Maryland Rule 16–751, as relevant, provides:
 "(a) *Commencement of disciplinary or remedial action.* (1) Upon approval of Commission. Upon approval or direction of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals."

2. That petition was amended, by *Amended Petition For Disciplinary Or Remedial Action*, to clarify that it was the principals of the respondent's law firm, Koehler & West, Chartered, rather than the firm itself, were involved in the events leading up to the disciplinary charges at issues and to identify more fully the transactions out of which the charges arose and the Rules that were alleged to have been violated. With regard to the latter, the Amended Petition mistakenly referred to the Conflict of Interest Rule as Rule 8. 1, rather than, as it is, Rule 1.8.

3. As amended, effective July 1, 2005, Rule 1.8, as relevant, provides:
 "(a) A lawyer shall not enter into a business transaction with a client unless:

property,[4] and 8.4, Misconduct,[5] of the Maryland Rules of Professional Conduct, as adopted by Maryland Rule 16–812, Maryland Rules 16–607[6] and 16–609[7] and Maryland Code

"(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;
"(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and
"(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction."

4. Rule 1.15 provides:
"(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
"(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
"(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved."

5. Rule 8.4, as relevant, provides:
"It is professional misconduct for a lawyer to:
\*　　\*　　\*　　\*
"(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
"(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
"(d) engage in conduct that is prejudicial to the administration of justice."
\*　　\*　　\*　　\*

6. Maryland Rule 16–607 prohibits the commingling of funds. It provides:

(1989, 2004 Repl.Vol.) § 10–306 of the Business Occupations and Professions Article, pursuant to which "[a] lawyer may not

> "a. General prohibition. An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 16–604 or permitted to be so deposited by section b. of this Rule.
>
> "b. Exceptions. 1. An attorney or law firm shall either (A) deposit into an attorney trust account funds to pay any fees, service charges, or minimum balance required by the financial institution to open or maintain the account, including those fees that cannot be charged against interest due to the Maryland Legal Services Corporation Fund pursuant to Rule 16–610 b 1(D), or (B) enter into an agreement with the financial institution to have any fees or charges deducted from an operating account maintained by the attorney or law firm. The attorney or law firm may deposit into an attorney trust account any funds expected to be advanced on behalf of a client and expected to be reimbursed to the attorney by the client.
>
> "2. An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.
>
> "3. Funds of a client or beneficial owner may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners."

7. Addressing Prohibited Transactions, Maryland Rule 16–609, at the time of the alleged misconduct, provided:

> "An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from any financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer."

The Rule was amended, effective January 1, 2008. It now reads:

> "a. Generally. An attorney or law firm may not borrow or pledge any funds required by the Rules in this Chapter to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose.
>
> "b. No cash disbursements. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer, and no cash withdrawal may be made from an automated teller machine or by any other method. All disbursements from an attorney trust account shall be made by check or electronic transfer.
>
> "c. Negative balance prohibited. No funds from an attorney trust account shall be disbursed if the disbursement would create a negative balance with regard to an individual client matter or all client matters in the aggregate.

use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer."

We referred the case, pursuant to Rules 16–752(a),[8] to the Honorable Michael J. Finifter, of the Circuit Court for Baltimore County, for hearing pursuant to Rule 16–757(c).[9] Following a hearing, at which the respondent appeared, participated and testified, the hearing judge found facts by the clear and convincing standard, Maryland Rule 16–757(b),[10] as follows (record references and footnotes omitted).

"Brian G. West, Respondent, was admitted to the Maryland Bar in 1978. In 1992 he was admitted to practice in Pennsylvania. During times relevant to this matter, Respondent practiced in Towson, Maryland, as a principal with the firm of Koehler & West, Chartered, hereafter 'K & W.' . . .

"The other principal in K & W, Lee Koehler, hereafter 'Koehler,' has been a member of the Maryland Bar for approximately 40 years. . . . Respondent and Koehler have practiced

---

8. Rule 16–752(a) provides:

"(a) Order. Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing."

9. Maryland Rule 16–757(c) provides:

"(c) Findings and conclusions. The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed. Unless the time is extended by the Court of Appeals, the written or transcribed statement shall be filed with the clerk responsible for the record no later than 45 days after the conclusion of the hearing. The clerk shall mail a copy of the statement to each party."

10. Maryland Rule 16–757(b) provides:

"(b) Burdens of proof. The petitioner has the burden of proving the averments of the petition by clear and convincing evidence. A respondent who asserts an affirmative defense or a matter of mitigation or extenuation has the burden of proving the defense or matter by a preponderance of the evidence."

together in one form or another for approximately 30 years.... K & W was a business oriented practice.... The Respondent and Koehler ended their joint practice on July 31, 2008....

"Koehler was unfamiliar with the administrative details of K & W because of his involvement in the resort business up until approximately 1991, when a real estate recession occurred and a number of large loans made to finance those operations went bad. Thereafter, Koehler was involved in litigation with a former business partner. This litigation is still ongoing....

"Koehler's litigation caused a financial drain on K & W. Koehler did not devote his full attention to the law practice and relied on Respondent to handle the operation of the law firm. Because Respondent has an MBA, Koehler left handling the financial and accounting for K & W to the Respondent. Respondent also spent a lot of time providing legal services relating to the litigation. In exchange for these services, Koehler gave Respondent a contingent fee on any recovery. In 2004, a partial recovery was obtained....

"K & W maintained an attorney trust account at Mercantile Safe Deposit & Trust, now PNC, dating back to 1996. Although both Respondent and Koehler had signatory authority on this account, Koehler very rarely used the account. K & W also maintained an operating account at Nations Bank/Bank of America, on which they both had signatory authority. Respondent issued most of the checks and kept the records for both these accounts. Respondent prepared the tax returns and took care of paying taxes for the firm. Koehler and Respondent also had a joint investment account at Janey Montgomery Scott....

"Koehler and Respondent were employees of K & W and received regular draws from the firm. The firm's profits were shared equally. K & W was operated informally. When leases for telephone and computer equipment were entered into by the firm, Koehler was aware of those transactions....

"In 1984, Thomas Rankin, hereafter 'Rankin,' a neurosurgeon practicing in York, Pennsylvania, decided to begin a

magnetic imaging/CT scanning business. Koehler was consulted by Rankin for legal advice regarding establishing the business. Rankin knew Koehler through another neurosurgeon, Dr. Ronald Paul, hereafter 'Paul.' Paul had attended college with Koehler. Thereafter, both Koehler and Respondent provided legal services in connection with raising the financing for and the start-up of Magnetic Imaging of York, Limited Partnership, 'MIY,' t/a York Imaging Center, 'YIC.' After MIY was established, Koehler and Respondent continued to provide legal services to the imaging center.... As time went on Respondent provided much more of the legal services to the imaging center than did Koehler....

"MIY's general partner was Advanced Technologies Associates, Inc. The original shareholders of this entity were Rankin, Paul and another neurosurgeon, Ivan Butler, hereafter 'Butler.' ...

"After the business was organized, Paul became the managing general partner and was responsible for the overall operation. Rankin moved away in 1985 but Butler remained in the area and Paul consulted him from time to time regarding important matters....

"In 1996, the general partners recognized Paul as the managing general partner and authorized him to receive a percentage of the profits as a management fee. Respondent was designated the Administrative Vice–President and, as such, was to assume Paul's duties in the event that Paul was absent from the area. Such powers were, however, only exercisable during such periods as were designated in writing from time to time by Paul. While Paul did not consent to Respondent's exercise of his duties in writing, there was an oral agreement that, when Paul left the area, Respondent was directed to assume his responsibilities....

"Thereafter, Respondent became the executive director of the imaging center and assumed the day to day oversight of its operation. As compensation, Respondent received 90% of Paul's management fee. Respondent did not discuss taking on the MIY management role with Koehler. When he heard

about it, Koehler was not in favor, however, he never told Respondent how he felt. Koehler told Paul that Respondent having a separate source of income could create a conflict of interest and working for the imaging center could blur the line between legal counsel and employee....

"After he became the executive director, Respondent continued to act as legal counsel for the partnership. As the attorney for the partnership, Respondent made the distributions to the limited and general partners. This usually occurred twice a year: at the end of the year and at tax time. Respondent would calculate and recommend to Paul the amounts to be distributed. Paul would then consent to the distribution of this amount and Respondent then transferred such funds from the MIY account to K & W's trust account and checks were sent to the partners from the trust account. Koehler played no part in handling the distributions....

"Respondent could sign on the limited partnership's bank accounts. In 1996, Paul's and Respondent's signatures were both required on the checks, however, at times, a stamp was used to place Paul's signature on checks used to pay invoices or bills. All other partnership bills and invoices were to be paid from the imaging center's bank account in York. When K & W provided legal services, the firm was to submit an invoice to the bookkeeper, Tiffany Small, and the bill would be paid from the partnership bank account. . . .

"According to Paul, Respondent was not authorized to make loans to the partners or officers of the corporation. On occasion, the imaging center borrowed money for the purchase of equipment and capital expenditures. Respondent could sign for the partners for these loans....

"The imaging center had a profit sharing plan. From 1996 through 2005, Respondent and Lee Koehler were trustees for this plan. The profit sharing funds also went into the K & W trust account and from there the funds were distributed by Respondent for the various investments chosen by the plan members....

"In October/November of 2001, while reviewing the financial statements for the business, Paul observed an inordinate amount paid for legal and accounting services. He reviewed the disbursement records for that period and found that Respondent had arbitrarily, without his advice or consent, written a check in June 2001 in the amount of $58,000 to K & W. There was a note in the disbursement records left by Respondent indicating that he felt that he had been underpaid for his trustee services and that he made the unilateral decision to go back 14 years and increase his fee from $1,500 per year to $5,000 per year and wrote the check to his firm for $58,000. Although the check bears Paul's signature, the signature was placed there by the use of a stamp. Paul was not aware of the disbursement in June 2001.... Koehler was not aware that his firm received the $58,000 from MIY in 2001....

"After making this discovery, Paul contacted the Respondent by e-mail about the $58,000 disbursement. Paul also asked Respondent to explain a check issued to K & W on September 9, 2001 in the amount of $15,000. This check was designated as a 'draw.' Respondent and Paul were not due management fees in September 2001. Paul also questioned the premature payment of a $5,000 trustee fee to K & W on October 31, 2001....

"Respondent returned Paul's e-mail on December 1, 2001, a few days after it was sent.... In this message, Respondent wrote that he understood Paul's remarks and was 'humbled by them.' Respondent indicated that he wanted to resolve the dispute over the disbursements but was unable to repay the funds immediately because of the 'nature of his practice' and the impact thereon from Koehler's lawsuit. Respondent promised to repay the disputed portion of the $58,000....

"After the exchange of e-mails, Paul and Respondent met. The meeting took place at the imaging center's office in York, where Respondent had an office.... The primary purpose of the meeting concerned the payment of the $58,000 for the trustee fee. Prior to the meeting, Paul had investigated the

**12**

usual and customary fees for third party administrators and trustees in the York–Harrisburg area and determined that Respondent may have been underpaid for these services. During the meeting, Paul told Respondent that he was very upset that Respondent had issued the $58,000 check, that doing so was totally inappropriate and that Respondent should not have issued the check without Paul's advice and consent. Respondent admitted that he had erred. Paul and Respondent came to an agreement that, instead of a retroactive reimbursement going back 14 years, Respondent would pay back $30,000. Respondent told Paul that he was unsure how he would pay this money back, but would come up with a proposal. . . .

"During this meeting, Paul made it clear to Respondent that all invoices for legal fees would have to be reviewed by him prior to being paid. Paul also directed that all checks would require two legitimate signatures and stamp signatures would no longer be used. Respondent continued to be one of the signers and Tiffany Small, the imaging center's bookkeeper, was made an authorized signer. Paul and Butler were also authorized to sign checks. Respondent agreed to go along with the changes discussed by Paul at the meeting. . . .

"During the meeting, Paul asked Respondent if there was anything else that he did not know about and Respondent told him that he had not repaid a loan he received from MIY. Paul was surprised to find out that a $30,000 loan he had authorized in 1997 had not been fully repaid by Respondent and told Respondent that the loan would have to be repaid. Respondent agreed to do so. . . .

"The terms of the 1997 loan are set out in a Promissory Note, dated October 29, 1997. Respondent signed the note as Vice President of K & W and promised that K & W would repay the $30,000 loan from MIY Limited Partnership t/a York Imaging Center (the 'Lender') with interest in the amount of 10% per annum on or before December 31,1997. . . . The note was witnessed by Don Wilson, the imaging center's in-house manager at the time. . . . The note was maintained in

the MIY offices in York. Respondent prepared an accounting of the payments made on the loan . . . .

"The first payment on the loan had been made on April 16, 2001 by check in the amount of $15,000 written on the K & W trust account. The second (and final) payment was made by check dated April 30, 2002, written by Respondent on the K & W trust account in the amount of $29,581.59 . . . .

"Subsequent to their meeting, Paul received a memorandum dated May 7, 2002 from Respondent. In this memorandum, Respondent proposed that he be paid $65,000 per year as the Privacy Officer to insure that the imaging center was in compliance with Federal privacy laws. The $30,000 trustee fee settlement figure would be paid back from payroll deductions from these funds. Respondent also proposed that he no longer receive a portion of Paul's management fee and, instead, be paid $60,000 per year from ATA, to be paid in $15,000 installments each on January 15th, March 15th, July 15th and October 15th. The management fee was to be paid from ATA funds. Since ATA did not have a bank account, the management fee was to be paid by Respondent from funds deposited to K & W's trust account from MIY. The trustee fee paid to Respondent and Koehler was to be increased from $1,500 to $3,500 per year. Paul expected that the trustee fee would be paid from the MIY bank account as it had been prior to 2002. Paul sent the memorandum to Butler and they discussed the proposal. Paul then told Respondent that he agreed to the proposal . . . .

"Although Paul instructed Respondent to submit all legal invoices to him before payment, he did not check to see if Respondent was following his instructions. Paul did not check to make sure that Respondent was taking the $60,000 management fee at the agreed intervals. Respondent did not show Paul invoices for attorney fees owed to K & W and Paul was unaware that attorney fees were paid to K & W from MIY funds deposited to the K & W trust account after 2002. Paul thought that a lot of things Respondent would normally have

charged a legal fee for would be covered under the 2002 salary arrangement. . . .

"In 2002, the imaging center purchased new MRI equipment from the Phillips Corporation. Citicorp financed the purchase. In January 2003, Citicorp sent MIY Limited Partnership a check in the amount of $160,000 to reimburse MIY for used equipment. On January 16, 2003, this check was deposited by Respondent to the K & W trust account. . . . The check was endorsed by Respondent as Executive Director of MIY payable to Koehler & West, Chtd, Escrow Account. . . .

"Paul was not aware at the time that the Citicorp check was deposited to K & W's trust account and he did not authorize Respondent to deposit those funds to the law firm's account. Paul did not find out that the check had been deposited to the K & W trust account until after he made a complaint to the Petitioner in 2006. Normally, checks from a vendor or creditor were deposited to the MIY bank account. . . .

"Respondent was terminated by Paul on November 11, 2005. Paul terminated Respondent for several reasons. First, Paul thought that Respondent was losing any sense of accountability to him as the managing general partner. Second, Paul discovered that Respondent was not presenting K & W legal invoices to him before writing checks to pay those invoices and, finally, Paul found out that Respondent had, without Paul's advice or consent, terminated the services of Robert Gantz, hereafter 'Gantz,' the partnership's accountant, and intended to take over the accounting responsibilities himself. . . .

"Respondent, as the attorney for ATA, prepared its tax returns. Gantz prepared the tax returns for MIY and Mag-Scan Associates, a professional corporation which hired and paid the imaging center's professional people. Gantz also prepared an annual audit required by creditor banks and by the private offering memorandum, which required third party oversight for accounting purposes. . . .

"After his discharge, Respondent was offered a severance package and Respondent and counsel for MIY, Anne Zerbe,

entered into negotiations. Paul made an offer and Respondent submitted a counter proposal. Respondent, however, wanted to be released from any liability and Paul refused to agree. No compromise was made and the offer was withdrawn. At the time, Paul made the offer to pay severance to Respondent, he was not aware that Respondent owed ATA or MIY money....

"At the time of Respondent's discharge, he maintained records for MIY and ATA in his law office in Towson. The partnership wanted these records so that they could continue business without interruption. Many of the records were returned by Koehler. MIY was told that some of the ATA records were kept by Respondent at his home and Koehler did not have access to these records. These records were not returned....

"Koehler communicated with the manager/CEO of the imaging center concerning the return of MIY records. Koehler told the imaging center that Respondent was unable to provide a reconciliation of receipts and disbursements for ATA because he had surgery on January 16, 2006 and was in the hospital until January 20, 2006. Respondent was to prepare the reconciliation when he returned to work....

"Gantz and Respondent exchanged email messages beginning in February 2006, in which Respondent was asked to provide these records. Although Respondent promised to return the records, as of June 21, 2006, Respondent had failed to do so. Respondent was also asked to explain why there was a discrepancy between the 2005 beginning cash balance per his accounting: $25,484.91; and the ending cash balance per the 2004 tax return: $58,911. Respondent replied that he had trouble bringing the 2004 tax return into balance and had 'adjusted cash.' ... Respondent did not offer any further explanation for the discrepancy.... Gantz prepared the ATA tax return for 2005....

"Before his discharge, Respondent provided an annual reconciliation to Gantz showing the amounts transferred to his trust account and the payments made from those funds. Paul

never compared these reconciliations to the financial records for the MIY bank account....

"In early 2005, there was some discussion between Respondent and Paul concerning the purchase of the business by Respondent. The business, however, only broke even in 2005 and it went out of business in June 2006....

"Ivan Butler was one of the shareholders in ATA. He retired from neurosurgery in 1995. Although, Butler had little involvement in the management of the imaging center, he frequently discussed the running of the imaging center and any major problems with Paul. Between 2000 and 2005, Butler rarely spoke with the Respondent. At income tax time, Butler got calls from numerous limited partners wanting to know about income tax forms. Butler would then contact Respondent by email concerning tax returns and disbursement checks and Respondent would promptly respond....

"Butler received distributions from both MIY and ATA. These payments were usually received at the end of March or the beginning of April. These checks would be written on the K & W escrow account and come with a yearly statement on the law firm's letterhead. Respondent would also provide a K-1....

"Butler was aware of and approved the steps taken by Paul in 2002 and was aware that changes were made in Respondent's agreement with the imaging center. Paul discussed with him Respondent's proposal that he receive a $60,000 annual management fee. Butler did not object to these changes. Butler never discussed the management fee or the trustee fee with Respondent and did not authorize Respondent to change the manner in which these fees were paid....

"In November 2005, Paul told Butler that he was going to discharge Respondent. Butler agreed with this decision....

"Diana Rankin is the wife of Thomas Rankin. She came to know Respondent as one of the lawyers who provided legal advice to the imaging center. In 1998, Mrs. Rankin took over her husband's shares of ATA. At that time she became aware

that Respondent had become an officer and was involved in running the business. . . .

"In 1988 the Rankins moved to Florida and in 1993 they moved to Wisconsin. Her husband's involvement with the business was limited to communications with Respondent about the business. From 2000 through 2005, neither Dr. or Mrs. Rankin had any involvement in the management of the imaging center. In late March or early April, Rankin received distributions from the proceeds of the imaging center. The distribution payments were sent by mail along with a letter on the K & W letterhead, a K-1 and a check from the K & W escrow account. After 1998, Rankin's shares were transferred to her and the distribution checks came payable to Mrs. Rankin. Respondent was consulted concerning transferring the ownership of the shares. Respondent said that he would have to get the approval of Drs. Butler and Paul. He later phoned back and said the transfer was approved. . . .

"The Rankins always had questions concerning the distribution or the K-ls. Although Mrs. Rankin would contact Respondent concerning these questions, she never felt she got a clear answer. Respondent never provided the documentation so that she would know what was going on. She did not receive copies of the ATA tax returns from Respondent. On at least one occasion, Respondent refused to take her call. Mrs. Rankin obtained an email address for the Respondent and had a better response from Respondent by this method. Respondent, however, did not respond to all of her email messages. Mrs. Rankin did not call Paul about her questions because Respondent told her that she should communicate with Paul through Respondent. . . .

"In January 2002, Mr. Rankin had an issue with the Internal Revenue Service (IRS) concerning the amount of taxes owed. On or about January 28, 2002, the IRS sent ATA a letter notifying it of a levy to attach to the full amount of any partnership distribution or other funds paid from ATA to Dianna Rankin. On or about March 5, 2002, Respondent responded to this letter as the attorney for ATA. Although

Respondent informed the IRS that, as of the date of service of the Lien/Levy Notice, ATA had no funds for which the obligation of payment to either Rankin was fixed and determinable and no funds would be transmitted to the IRS, he, pending resolution of the IRS issue, withheld the distribution payment due to Mrs. Rankin in March 2002. . . .

"Respondent timely refuted any efforts by the Internal Revenue Service to lien monies due from ATA to or for the benefit of Dianna Rankin and/or Thomas Rankin.

"The Rankins were represented by an attorney named Steve Anderson. It was the Rankins' position that the distribution for 2002 should be paid to Mrs. Rankin or, if Respondent was unwilling to do that, the funds should be sent to Mr. Anderson to be held in his law firm's escrow account. Respondent disagreed with the Rankins and said he was going to hold the money in an interest bearing account under his control. Although Mrs. Rankin did not agree to Respondent's terms, he refused to release the money to either her or her lawyer. . . . Petitioner did not produce any evidence of a written demand from Dr. or Mrs. Rankin for interest from the point of payment of the funds in 2003 until the hearing on this matter on October 15, 2008.

"Despite Mrs. Rankin's efforts to have Respondent release the funds, he did not do so until March 2003. At that time he sent a portion of what was owed to the Rankins' attorney. The balance of the funds were not paid until October 2003. Respondent did not pay interest on the funds withheld. . . .

"Although no funds were received for distributions in 2002, Mrs. Rankin received a K-1 for that year. Respondent prepared this document. Mrs. Rankin testified that there was a discrepancy of as much as $70,000 between the amount listed on the K-1 she received for 2003 and the monies that were disbursed to her and she still has questions about how much she received. . . .

"In January or February 2005, Respondent approached Mrs. Rankin about purchasing the imaging center. He told Mrs. Rankin that Drs. Butler and Paul were thinking about

selling and then asked if she would join Respondent and Dr. Omara in buying the imaging center. Mrs. Rankin said no. Respondent asked her not to tell Drs. Butler and Paul about his offer; however, she subsequently spoke to them and asked what was going on with the imaging center. They told her that they were considering selling the business to a neuro-surgical group. . . .

"In November 2005, Mrs. Rankin spoke with Respondent about the K–1 she received that past year. Her husband had received information from Paul concerning the profits of the company and figured that she should have received more. Respondent was sent an email but did not respond. Shortly thereafter, Mrs. Rankin found out he was discharged and there were no further communications with Respondent. . . .

"In the Summer of 2006, Paul, Butler and Mrs. Rankin made complaints to the Petitioner. Butler did so because he was aware that there were some funds for which Respondent had not accounted and Respondent would not release docu-ments such as the records for ATA needed to file the tax return for ATA. . . .

"Mrs. Rankin complained because she felt that she was owed interest on the money held by Respondent and wanted the ATA documents held by Respondent and wanted docu-mentation for the amounts of the distributions. She has never been provided these records. . . .

"Petitioner conducted an investigation. In 2007, during the investigation, Respondent produced two Demand Promissory Notes dated January 15, 2002 and January 15, 2003. . . .

"According to Paul, he had not seen or been aware of these notes or loans from ATA to K & W prior to 2007 and Respondent was not authorized to borrow money from ATA either in his personal capacity or as the representative of the law firm. The only money Respondent was authorized to take from the MIY bank accounts were funds relating to the profit sharing plan, the distribution to the partners, his management fee and the trustee fee. Paul was not aware during 2002

through 2005 that Respondent was taking funds from MIY for other purposes. . . .

"Neither Butler nor Mrs. Rankin were aware of loans in 2002 and 2003 to K & W from ATA. Butler agreed with Paul that Respondent was not authorized to borrow money from ATA. Butler was not aware of either of the Demand Promissory Notes. . . .

"John DeBone is an employee of the Petitioner. His duties include the analysis of attorney trust accounts. In August 2006, he was assigned to the investigation of complaints made against Respondent. He prepared a summary of the transactions in the K & W attorney trust account for the period January 1, 2001 through February 28, 2007. He also prepared other lists and calculations contained in Petitioner's exhibits 5, 6 and 8.

"DeBone's review of the K & W trust account disclosed that Respondent: commingled personal funds in the trust account; paid personal and firm tax obligations from the trust account, failed to hold some funds owed to Mrs. Rankin in trust and used trust funds for unauthorized purposes. . . ."

Based on these findings of fact, the hearing judge concluded that the respondent violated each of the charged Rules and § 10–306. With regard to § 10–306 of the Business Occupations and Professions article, prohibiting the use of trust money for a purpose other than that for which the money was entrusted, the hearing court concluded that the violation consisted of paying, without authorization, from funds held for the benefit of his client, MIY/ATA, attorneys fees to his law firm, the tax obligations of a client, and a management fee to himself. The court further determined that the respondent used funds held in trust for Ms. Rankin to pay taxes he and his law firm owed and that these payments were neither authorized by Ms. Rankin nor known by her to have been made. In addition, the respondent's trust account was found to have fallen below the amount held in trust, which also was a violation of Rule 1.15(a). Having found the violation of § 10–306 to have been willful—the hearing judge rejected the

respondent's defense that he borrowed the funds and that, given his position with ATA, he had the authority to make the loan, the hearing judge concluded that the charged Rule 8.4(b) violation naturally and logically followed.

Turning to the other charged Rule 8.4 violations, the hearing judge identified various conduct which he concluded involved "dishonesty, deceit, and misrepresentation," Rule 8.4(c), which, therefore, was "prejudicial to the administration of justice." Rule 8.4(d). As to the conduct, the hearing judge determined that the respondent's use of MIY/ATA funds for personal and business purposes, including the payment of his management fees, was dishonest, as was his "knowing[ ] misrepresent[ation of] the amount of cash on hand for ATA on the 2004 tax return." Moreover, Judge Finifter concluded that the deception and misrepresentation continued after the respondent was discharged: by not explaining the discrepancy between the 2004 ending balance and the 2005 beginning balance and by misrepresenting the purpose and timing of certain disbursements from the K & W trust accounts. From this conduct, the hearing judge opined:

"Conduct that impacts on the image or public perception of the legal profession, and that engenders disrespect for the legal profession may, be prejudicial to the administration of justice. Lawyers are officers of the court and their conduct must be assessed in that light. *Attorney Grievance Commission v. Painter,* 356 Md. 293, 306–07, 739 A.2d 24, 32 (1999). Misappropriating trust funds, using trust funds without authorization to pay personal and/or business expenses and engaging in conduct involving dishonesty, deceit and misrepresentation are all conduct likely to bring the legal profession into disrepute in violation of MRPC 8.4(d). *See, Attorney Grievance Commission v. Parker,* 389 Md. 142, 155, 884 A.2d 104, 112 (2005) When a lawyer enriched himself . . . at the client's expense the conduct violated MRPC 8.4(d); *Attorney Grievance Commission v. Nussbaum,* 401 Md. 612, 642, 934 A.2d 1, 18 (2007) (Misappropriation of client funds by a lawyer is prejudicial to the administration of justice)."

Maryland Rule 16–607 was violated, the hearing judge found, when "Respondent deposited numerous checks written on personal accounts to the attorney trust account thereby commingling those funds." Judge Finifter determined that this conduct also violated Rule 1.15(a) and (c). With regard to Maryland Rule 16–609:

> "Respondent's admission that he borrowed funds in 2002 and 2003 from the firm's attorney trust account provides clear and convincing evidence that he violated Maryland Rule 16–609 which expressly forbids such conduct. The evidence established that the 2002 loan was made from the deposit of a $59,000 check from the MIY account.... Respondent was entrusted with MIY funds because of his role as attorney for the imaging center. Respondent apparently recognized that the funds were being received in trust since he deposited the funds to the attorney trust account. The 2003 loan was disbursed prior to the deposit of the $ 160, 000 check payable to and intended for MIY. The loan was therefore actually made from funds held in the trust account for other clients."

(Record references omitted).

Emphasizing that the "Respondent did not disclose to ATA or its managing member ... that it was entering into this financial transaction (loan) with its lawyers," the hearing judge found a violation of Rule 1.8(a). He explained,

> "[a] loan the client was not aware of could not be fair or equitable to the client. Although the Demand Promissory Notes called for interest and collection costs upon default by the maker, it is impossible to imagine how Respondent could have considered the terms of a Demand Promissory Note to be either fair or equitable to the lender when the lender was not aware of the loan and was, therefore, unable to demand payment."

In addition to the violations of Rule 1.15(a) and (c) that he already had found, see discussion of § 10–306 and Maryland Rule 16–607, both *supra,* the hearing judge concluded that the respondent violated Rule 1.15(b) as well. That violation was

committed when the respondent came into possession of funds payable to his client, MIY, which he deposited in his attorney trust account, but did not promptly deliver them to the client. Rule 1.15(b) also was violated when he retained, for the better part of a year, the portion of the 2002 ATA distribution to shareholders intended for Ms. Rankin, made only a partial distribution when distribution was made, and failed satisfactorily to account for the remainder.

Neither the petitioner nor the respondent takes exception to the findings of fact made by the hearing judge.[11] Maryland Rule 16–759(b)(2) [12] instructs that the findings of fact made by the hearing judge may be treated as established for purposes of determining the appropriate sanction. *See Attorney Grievance Comm'n v. Snyder,* 406 Md. 21, 28, 956 A.2d 147, 150 (2008); *Attorney Grievance Comm'n v. Nichols,* 405 Md. 207, 216, 950 A.2d 778, 784 (2008); *Attorney Grievance Comm'n v. Elmendorf,* 404 Md. 353, 360, 946 A.2d 542, 546 (2008); *Attorney Grievance Comm'n v. Logan,* 390 Md. 313, 319, 888 A.2d 359, 363 (2005). We accordingly so treat the findings of fact.

The respondent does except to most of the hearing judge's conclusions of law. He concedes, however, that, although he did not intend, by so doing to violate any ethical rules, he did deposit and disburse personal items from his law firm's escrow account. As to that conceded violation of Rule 1.15(a) and Maryland Rule 16–607, the respondent declares himself "prepared to accept such punishment, although it is proffered that

---

11. Although the petitioner does not except to the findings of fact, even those pertaining to the "Mitigation," it does "except" "to the extent that the 'pressures' described by Respondent were found to mitigate, and therefore arguably could warrant a lesser sanction for the intentional misappropriation of trust funds." The hearing judge made no such finding and offered no such conclusion. Accordingly, the "exception" is overruled.

12. Maryland Rule 16–759(b)(2) provides:
 "(2) Findings of fact.
 "(A) If no exceptions are filed. If no exceptions are filed, the Court may treat the findings of fact as established for the purpose of determining appropriate sanctions, if any."

this conduct should not call for significant punishment from this Court."

The gravamen of his exceptions is that Judge Finifter erred in its determination of what to make of the facts as found, that, given the facts, he could not have committed the violations charged.

With regard to § 10–306, the respondent argues that, as president of ATA, "without restriction on the extent of such powers," he was authorized to make loans on behalf of the company, even to officers of the company. That is true, he submits, because "[a]s President, [he was] authorized to conduct ATA's business affairs, which includes making all decisions on behalf of MIY as ATA was the sole general partner of that partnership." Moreover, the respondent thinks it dispositive of the payment of legal fees and other costs of his law firm that "these amounts were provided to MIY's accountant, were deducted on MIY's tax returns and set forth on MIY's financial records, albeit at the end of each calendar year. All of these records were available to the ATA's shareholders, who admitted they never requested any such information during the years in question."

The respondent's argument against the conclusion that he violated Rule 8.4(b) is related, depending also on his duties as Executive Director/de facto president of ATA being expansive. From that premise, he proffers that he "reasonably believed his actions were authorized."

Conceding that the account at issue in this case was his attorney trust account, the respondent attacks the finding that he violated Maryland Rule 16–609 by arguing that the evidence showed that ATA was using that account as its "normal business checking account," which, he maintains, the hearing judge ignored. The respondent also disputes the premise on the basis of which Judge Finifter determined that the loans to the respondent were made from funds from other clients. He maintains that the flaw in the analysis was in starting with an arbitrary date and concluding that the running balances were actual balances.

The respondent's position with regard to Rule 1.8(a) is that he was not acting as an attorney when the questioned transactions occurred. In any event,

"Respondent asserts that he undertook such actions without intent (much less willful intent) to violate any rule of professional conduct, as he consistently believed his roles to be separate, that his actions on behalf of ATA [were] not undertaken as an attorney, but as [a] corporate officer of a non-professional corporation."

In maintaining that the hearing judge erred in concluding that he violated Rule 1. 15, other than as he has conceded, the respondent continues to rely upon the office he held and, as a result, the prerogatives the powers of the office gave him. In addition, the respondent argues that he could not have withheld funds due to Ms. Rankin when there was no obligation to disburse those funds to her, the funds not being hers. The soundness of his reasoning depends upon the correctness of his testimony, on which the respondent's conclusion depends and which, coincidently, the hearing judge did not accept. Critical to the respondent's challenge to the hearing judge's determination that he misappropriated Ms. Rankin's funds is his premise that Judge Finifter made an error in its calculation of the amount of the distributions to which Ms. Rankin was entitled.

The respondent's exception to the Rule 8.4(c) finding focuses on the capacity in which he acted when making "the loans, payments and other disbursements complained of by Petitioner." In contradiction to the hearing judge's findings, he maintains that, in so acting,[13] he was acting not as an attorney, but pursuant to "his powers as Executive Director and de facto President." Although the respondent concedes that there were misstatements on the tax returns, he denies that they were material or made with the intent to deceive the taxing authorities. Finally, he disputes the hearing judges's

---

**13.** The respondent admits that he should not have made the payment of his management fee during 2004 and 2005 other than at the time agreed.

conclusion that he acted dishonestly and deceitfully during the investigation of this matter. That dispute is based on the respondent's disagreement with Judge Finifter's analysis of the facts from which the violation conclusion was drawn.

Because the respondent concludes that he has not engaged in the conduct that the hearing judge found that he did, it follows, and he maintains, that he did not violate Rule 8.4(d) by "engag[ing] in ... conduct that impacts on the image or public perception of the legal profession, and then engenders disrespect for the legal profession or may be prejudicial to the administration of justice."

 It is well settled that our review of the hearing judge's conclusions of law is "essentially *de novo.*" *Attorney Grievance Comm'n v. Dunietz,* 368 Md. 419, 428, 795 A.2d 706, 711 (2002) (quoting *Attorney Grievance Comm'n v. Thompson,* 367 Md. 315, 322, 786 A.2d 763, 768 (2001) (quoting *Attorney Grievance Comm'n v. Briscoe,* 357 Md. 554, 562, 745 A.2d 1037, 1041 (2000))). *See* Maryland 16–759(b)(1); [14] *Attorney Grievance Comm'n v. Hall,* 408 Md. 306, 322, 969 A.2d 953, 962 (2009); *Attorney Grievance Comm'n v. Goff,* 399 Md. 1, 27, 922 A.2d 554, 569 (2007); *Attorney Grievance Comm'n v. Mahone,* 398 Md. 257, 265–66, 920 A.2d 458, 463 (2007); *Attorney Grievance Comm'n v. Mba–Jonas,* 397 Md. 690, 700, 919 A.2d 669, 675 (2007); *Attorney Grievance Comm'n v. McLaughlin,* 372 Md. 467, 493, 813 A.2d 1145, 1160 (2002). We also have pointed out that "[i]f the hearing judge's factual findings are not clearly erroneous and the conclusions drawn from them are supported by the facts found, a party's exceptions to conclusions of law will be overruled." *Hall,* 408 Md. at 322, 969 A.2d at 962, citing *Goff,* 399 Md. at 28, 922 A.2d at 570; *Mba–Jonas,* 397 Md. at 700, 919 A.2d at 675; *Attorney Grievance Comm'n v. Manger,* 396 Md. 134, 146–47, 913 A.2d 1, 8 (2006). *See Attorney Grievance Comm'n v. Kalil,* 402 Md.

---

14. Maryland Rule 16–759(b)(1) provides:
"(b) *Review by Court of Appeals.* (1) Conclusions of law. The Court of Appeals shall review de novo the circuit court judge's conclusions of law."

358, 368, 936 A.2d 854, 860 (2007); *Attorney Grievance Comm'n v. Robertson,* 400 Md. 618, 629, 929 A.2d 576, 583 (2007).

As we have seen, the respondent took no exceptions to the facts found by the hearing judge, permitting us, as we have done, to treat those findings as established for purposes of determining the appropriate sanction. Nevertheless, because many of the respondent's exceptions to the conclusions of law drawn by the hearing judge, his application of the law to the facts found, require a review of the facts, we have conducted an independent review of the factual findings. As a result, we are satisfied that they are not clearly erroneous, *Goff,* 399 Md. at 28, 922 A.2d at 570, and that they support the conclusions the hearing judge drew from them. To sustain the respondent's exceptions would require that we accept the respondent's version of the facts, his interpretation of particular rules or his application of the law to the facts, none of which we can or should do. Accordingly, we overrule the respondent's exceptions.

We turn to the determination of the appropriate sanction. The petitioner submits that disbarment is the appropriate sanction, and, therefore, recommends its imposition. It emphasizes that the hearing judge found that the respondent misappropriated trust funds, engaged in conduct that was dishonest and deceitful and made misrepresentations, all in prejudice to the administration of justice. The respondent, on the other hand, conceding "that he should have been more circumspect in his dealings with MIY Limited Partnership," offers that censure or, at worse, an indefinite suspension with the right to apply for readmission within a reasonable period of the suspension is the appropriate sanction for the misconduct in this case.

Although the goal of attorney discipline is the protection of the public, rather than the punishment of the erring attorney, *Hall,* 408 Md. at 335, 969 A.2d at 970, it is well settled, where misappropriation, or other intentional dishonest conduct, *see Attorney Grievance Comm'n v. Vanderlinde,* 364

Md. 376, 418, 773 A.2d 463, 488 (2001), has been found, disbarment is the default, in the absence of compelling extenuating circumstances justifying a lesser sanction. *Attorney Grievance Comm'n v. Nussbaum*, 401 Md. 612, 644, 934 A.2d 1, 20 (2007) and cases cited therein.

The hearing judge determined that the respondent proved facts in mitigation,[15] by a preponderance of the evidence, *see* Maryland Rule 16–757(b), as follows:

"This matter is the first attorney grievance proceeding against Respondent in thirty years of practice.

"Respondent underwent major abdominal surgery in 2003, and had repeat surgeries in 2004 and 2006.

"In 1995, Respondent's spouse was diagnosed with Multiple Sclerosis which has hindered her ability to work.

"Respondent's law partner, Lee N. Koehler, underwent quintuple heart bypass surgery in 2002, which restricted his ability to work for a substantial period of time following that surgery.

"Throughout the period at issue in the matter, Lee N. Koehler spent, by his own admission, 'massive' amounts of his legal time working on a personal lawsuit against a former partner in an unrelated hotel business, which significantly reduced the amount of time that Mr. Kohler could spend on matters for clients generating income for Mr. Koehler's and Respondent's law firm."

Significantly, the hearing judge noted, as to these findings:

"Respondent did not contend that these pressures were an excuse for or caused him to use trust funds to pay the firm's expenses or to keep this information from his clients, but rather an explanation as to some of the pressures that he was under during the time."

---

**15.** Maryland Rule 16–757(b) provides:

"(b) Burdens of proof. The petitioner has the burden of proving the averments of the petition by clear and convincing evidence. A respondent who asserts an affirmative defense or a matter of mitigation or extenuation has the burden of proving the defense or matter by a preponderance of the evidence."

(Record references omitted). That he believed the misconduct in this case to be quite serious and did not believe that the mitigating factors excused or caused the respondent's misconduct is made clear by Judge Finifter's summing up:

"The clear and convincing evidence established that from 2000 through 2005, Respondent's law firm had financial problems and that, in order to remedy these problems, Respondent used client funds held in his attorney trust account to pay the firm's obligations. The clear and convincing evidence also established that, in order to prevent the discovery of the misappropriation, Respondent engaged in dishonest and deceitful conduct."

The respondent's defense is consistent with, and supports, the judge's observations. Moreover, in his response to the petitioner's rebuttal, the respondent claimed only that the mitigating factors found by the hearing judge were relevant, not that they were dispositive.[16] Indeed, in his submission containing his exceptions and his sanction recommendation, the respondent does not suggest, much less argue, that it is the existence of the mitigating factors that justifies the reduced sanction he proffers as appropriate.

We agree with the petitioner and the hearing judge, while there clearly was established misappropriation and dishonest and deceitful conduct, compelling extraneous circumstances justifying a lesser sanction were not. Accordingly, the appropriate sanction is disbarment.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTOR-*

---

**16.** The respondent chided the petitioner for arguing that the mitigating factors should have no bearing on the disposition of the case, noting, "[w]hile such pressures may not fully excuse Respondent's conduct, to argue they should have no bearing on the disposition of this case is unreasonable, incorrect and should be ignored by this Court."

**30** ■■■■■■■■■■■■■■■
■■■■■■

*NEY GRIEVANCE COMMISSION AGAINST BRIAN GRAYSON WEST.*